evidence undermines confidence in the outcome of the trial or, stated differently, where the citizen has not been afforded a fair trial.[59] This duty is continuing and does not terminate at the conclusion of the trial. *See e.g., United States v. McVeigh*, No. 96-CR-68-M, 1997 U.S. Dist. Lexis at 32-33 (D. Colo. January 28, 1997) (addressing the continuing nature of the government's constitutional duty to disclose exculpatory evidence in conjunction with Rule 16).

**FACTS**

The key issue in this case was whether there was federal jurisdiction. Trial counsel was well aware of this key issue and, accordingly, filed a motion for bill of particulars addressing the

---

[59] According to the Supreme Court:

The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the Government's evidentiary suppression "undermines confidence in the outcome of the trial.

The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. (footnote omitted)

*Kyles v. Whitley*, *supra* at 434-435.

alleged foreign commerce. In response, the government voluntarily filed a bill of particulars. Thus, the indictment, as amplified by the government's bill of particulars, established two potential jurisdictional basis which would be critical at trial: (1) Garza's alleged calls from Mexico to Martinez in Brownsville (which as subsequently conceded by the government, all would have occurred prior to February 14, 1993); and (2) the car crossing on March 2, 1993. This **CLAIM FOR RELIEF** relates to the first jurisdictional basis, the alleged calls by Garza from Mexico.

Regarding the first jurisdictional basis of the first element of the offense -- alleged calls from Garza in Mexico to Martinez in Brownsville -- trial counsel had the following information prior to trial:

**REST OF PAGE INTENTIONALLY LEFT BLANK**

**A.** Martinez' prior state court testimony which reflected that she had previously testified in the state court litigation that **Garza had called her from Dallas and San Antonio: she never claimed that Garza had ever called her from Mexico**. State Trial Record at pages 1434-1441. *See* **Exhibit 2**.[60]

**B.** From discovery in this case,[61] trial counsel were aware from an FBI 302 (memorandum of interview) that on August 29, 1996, Maria Martinez had related to FBI Agents Barry Ross and Jorge Cisneros that Garza had called Martinez on numerous occasions, but Martinez did not discuss with them the locations from which Garza had allegedly called her. *See* **Exhibit 3**.

---

[60] This sworn testimony reflected that after **Halloween 1992**, the only calls that Martinez received from Garza were as follows:

1. In December 1992, Garza called her from Dallas, at which time he had not been able to come or do anything yet. **Exhibit 2** at 1434.

2. In January 1993, Garza called her once from Dallas, at which time he did not say anything other than that he was busy and that he would come to Brownsville. **Exhibit 2** at 1437.

3. In February 1993, Garza called her twice; once when he said "I'll be there any moment now" (and nothing else, referring, obviously, to the fact that he was going to stop by Martinez' business and was calling from Brownsville), and again from Dallas. **Exhibit 2** at 1439-1442.

4. On March 3, 1993, Garza called her and told her he was coming over to pick up the money (obviously from Brownsville). **Exhibit 2** at 1442.

[61] Cisneros' numerous motions for production of Jencks Act materials and *Brady* and *Giglio* information (pretrial motions numbered 19, 20, 21, 24, and 25 on the District Clerk's docket) were granted at the pretrial hearing on April 27, 1998. *See* 1R238-239 (courtroom minutes); Transcript of April 27, 1998, pretrial hearing.

C. From discovery in this case, trial counsel were aware from an FBI 302 (memorandum of interview) that on January 28, 1998, Maria Martinez had related to FBI Agents David Church and Freddy Vela that Garza had told Martinez during their telephone calls that he (Garza) was calling from Dallas and San Antonio, that Garza called Martinez collect every time he called her, and that Martinez was unaware of any telephone calls made to her by Garza that originated from outside of the State of Texas or from Mexico. *See* **Exhibit 4**.[62]

---

[62] That memorandum stated:

"Martinez recalled four to five conversations, by telephone, with Garza in which he inquired why "La Clienta" (Cisneros) was taking so long to get Martinez the picture of Joey Fischer for the hitmen. Martinez stated that these calls were placed from Dallas and San Antonio, Texas, according to Garza. Garza also called Martinez collect every time he contacted her by telephone. Martinez advised that she was unaware of any telephone calls made to her by Garza or Cisneros that originated outside of the State of Texas or from Mexico. Martinez added that she did not make any calls to Garza or Cisneros from outside the State of Texas or from Mexico."

**D**. From discovery provided by the government on April 24, 1998, trial counsel were aware that there were no collect calls from Mexico to Martinez' home or business telephone numbers.[63]

---

[63] On November 24, 1997, the government had subpoenaed the subscriber information and toll records for Maria Martinez' store at 713 E. 11th Street (210-546-8137). Records responsive to this subpoena were faxed to the government on December 3, 1997. *See* **Exhibit 5**. The documents responsive to this subpoena, as well as the documents responsive to the subpoena FBI Agent David Church "returned" to the Houston grand jury Church on February 23, 1998 (as reflected by his grand jury testimony, which is a sealed exhibit in the vault of the District Clerk and thus not attached hereto as an exhibit), reflect the following:

Collect Telephone Calls To Maria Martinez' **Home Telephone Number** (210-544-6319) **for the time frame of 10/97 to 3/3/98** (Which Phone Was Actually Under The Name Of George V. Rosales, 1049 C. Street, Brownsville, Texas), as reflected by documents returned on 2/23/98 by Church to the Houston Grand Jury:

| Date | Place Called From | Nature Of Telephone Called From |
|---|---|---|
| 1/27/98 | Brownsville | Local Coin |
| 1/29/98 | Brownsville | Local Coin |
| 2/16/98 | Brownsville | Local Coin |
| 2/16/98 | Brownsville | Local Coin |
| 2/25/98 | Dallas | Private Phone (214-559-7031) |

Collect Telephone Calls To Maria Martinez' **Business Telephone Number** (210-546-8137), **for the time frame of 10/97 to 3/3/98**, which was under the name of Maria Martinez, 713 E. 11th Street, Brownsville, Texas (fax to government on 12/3/97):

| Date | Place Called From | Nature Of Telephone Called From |
|---|---|---|
| 11/20/97 | Brownsville | Local Coin |
| 12/21/97 | Martinez, Texas | Private Phone (210-661-4288) |
| 2/20/98 | Worthing MN. | Local Coin |

**E.** From discovery provided by the government and from their previous involvment in the state trial and/or state appeal, Cisneros' trial counsel also had the following eight (8) prior statements and prior testimony from Garza, to wit:

**1.** On March 31, 1993, Garza signed a five (5) page handwritten statement which had been written for him by Deputy Abel Perez, which was reduced to a three (3) page typewritten statement (which he also signed). *See* **Exhibit 6**. No calls from Mexico were mentioned, although Garza did state that he had called Martinez from San Antonio (pages 1 and 3 of typewritten) and Brownsville (page 1 of typewritten).

**2.** On March 9, 1994, during his state court trial, Garza testified. *See* **Exhibit 7** (Vol. 31, pages 39-96 of state court record). Garza did not claim that he had called Martinez from Mexico, although Garza testified that he had called Martinez from San Antonio (page 48 of Vol. 31).

**3.** On June 28, 1996, Garza was interviewed by FBI Agents Barry Ross and Jorge Cisneros. *See* **Exhibit 8**. No calls from Mexico (or any other location) were mentioned by Garza.[64]

---

[64] One aspect of Cisneros' anticipated motion for discovery (to be filed in connection with this motion in the near future) will be a request to depose FBI Agents Ross and Cisneros to ascertain whether they induced Garza to speak with them by alluding to potential benefits he might receive from the federal government. Obviously, if there were inducements discussed during their initial meeting, they should have been disclosed to trial counsel notwithstanding the ultimate "deal" as testified to by Garza at trial (i.e., no benefits other than non-prosecution in federal court for the murder for hire). Additionally, FBI Agents Church and Vela should also be deposed to ascertain whether the topic of potential benefits was discussed with Garza in February 1998 or at any date thereafter and prior to Garza's testimony on May 11, 1998. If benefits were discussed with Garza, this motion would have to be amended to include that additional *Brady* violation as the substance of any benefits Garza sought was never disclosed to trial counsel. Similarly, if discovery provides that the "deal" testified to by Garza at Cisneros' trial was not the actual "deal" that Garza anticipated, this motion would have to be amended to incorporate that perjured testimony.

4. On September 30, 1996, FBI Agent Ross received a letter from Garza, dated September 2, 1996. No calls from Mexico (or anywhere else) were mentioned, although Garza indicated his willingness to assist if certain conditions of cooperation could be met. *See* **Exhibit 9**.

5. On November 22, 1996, Garza was interviewed by FBI Agents Barry Ross and Jorge Cisneros. No calls from Mexico (or any other location) were mentioned by Garza. *See* **Exhibit 10**.

6. On December 9, 1996, Special Agent Ross received a letter from Garza, dated December 3, 1996. No calls from Mexico (or anywhere else) were mentioned, although Garza indicated his willingness to assist if certain conditions of cooperation could be met. *See* **Exhibit 11**.

7. On February 5, 1998, Garza was interviewed by FBI Agents David Church and Freddy Vela. This memorandum of interview reflects the following:

> "Garza advised, before Fischer was murdered, he would call Martinez quite often regarding his martial problems. According to Garza, during every phone conversation, Martinez would ask about the job to kill Fischer. Garza stated Martinez would refer to the job as a "roof job". **Garza recalled making several calls to Martinez from public telephones in Matamoros, Mexico, and each time Martinez referred to the "roof job" by asking when Garza would find someone to do the job. Garza also advised he would *always call Martinez collect*.**" (emphasis added) *See* **Exhibit 12**.

8. On February 18, 1998, Garza was interviewed by FBI Agents David Church and Freddy Vela. This memorandum of interview reflects the following:

> " **Garza advised he made telephone calls from *Matamoros, Mexico*, using public telephones between *September and November 1992*, to call Maria Martinez. According to Garza, these calls were *all collect calls*. Garza could not recall where the public telephones he used in *Matamoros* were located.**" (emphasis added) *See* **Exhibit 13**.

On April 20, 1998, the government filed a bill of particulars indicating that Garza had called Martinez from Matamoros and San Fernando, Mexico, from in or about November 1992 to in or about February 1993. 2R320-321. **No explanation was given as to where or why the time frame and locations had changed from that which was related by Garza to the FBI on February 18, 1998**, as reflected above in paragraph **E8**.

Shortly before trial, both Cisneros' trial counsel interviewed Garza in the Cameron County Jail. At that time, Garza told trial counsel that he had not called Martinez from Mexico and/or that he could not remember calling Martinez from Mexico. 11R1395-1397.

Thus, as of the last known interview with Garza on February 18, 1998 (except as contradicted by Garza's statements to Cisneros' trial counsel in the Cameron County Jail), Garza had only mentioned calling Martinez from Matamoros, Mexico, **on two of eight occasions he had communicated with law enforcement and/or had testified in open court**, and then, the time frame was identified as between *September and November 1992.*[65]

---

[65] Garza's statement in (paragraph **E8**) that the calls were between September and November 1992 thus reflects that the calls from Mexico all occurred **prior** to the date that he learned, for the first time, that Fischer was to be killed. This necessarily follows because Garza testified that it was late January 1993 or early February 1993 when Martinez told him for the first time that the client wanted Fischer killed (as opposed to hurt or beaten, as was the alleged, original request). 11R1360-1363.

At trial on May 11, 1998, Daniel Garza grossly modified his story and testified to the following on direct examination:

1. Garza testified he called Martinez in Brownsville from Mexico on four occasions and that on at least one of those, Martinez broached the topic of whether he had found a hit man, but he (Garza lied about it). 11R1366-11R1368.

2. Garza testified that the four calls he made from Mexico to Martinez in Brownsville were all made in **late 1992 or early 1993**. 11R1366. The calls were all placed by Garza to talk to Martinez about his personal affairs, but according to Garza, she inquired of him on at least **one** of the calls about the job and he lied to her by telling her that he had found someone to "knock down the roof on the house and put it back up." 11R1367-1368.

3. Garza further testified that **although he might have called Martinez collect once from Mexico, the FBI was mistaken if they wrote down that he had always called collect from Mexico to her, 11R1398-1399, and added that he actually called Martinez from phone booths or casetas and had not kept the receipts he had obtained.** 11R1402-1405.

At no time after the government produced the statements/FBI 302's reflected above in paragraph **E1** to **E8** did the government ever tender any additional information relating to Daniel Garza's claim of having made collect telephone calls or any memoranda or notes reflecting **when and why** Garza grossly modified his story from that reflected by the February 5 and 18, 1998, statements to the FBI.[67]

At the conclusion of Garza's direct examination, trial counsel failed to seek an explanation from the government or the District

---

[67] Presumably the absence of any FBI 302's after Agents Church and Vela interviewed Garza on February 18, 1998, was because Garza was not interviewed **after February 18, 1998, and before he testified at Cisneros federal trial in May 1998**. Otherwise, the government presumably would have produced any FBI 302 of any such interview since the government produced FBI 302's as to all contact with Garza by the FBI, as delineated above in paragraphs **E3** to **E8**.

Court regarding Garza's gross modification of his story. **However, the government did not provide any additional statements to Cisneros' counsel or elicit an explanation on direct examination as to when and why Garza had grossly modified his story, as reflected by comparing his trial testimony summarized immediately above and his statements to the FBI on February 5 and 18, 1998.**

During Cisneros' defense, trial counsel called FBI Agent David Church to impeach Garza's trial testimony.[68] According to Church, Garza had hold him that all calls from Mexico to Martinez had been made collect and that he (Church) had checked Martinez' telephone records and had been unable to locate even one collect call from Mexico. 11R1483-84. However, trial counsel did not seek an explanation from Agent Church while he was on the witness stand regarding Garza's gross modification of his story. On cross-examination of Church, **the government did not elicit any explanation as to why Garza had grossly modified his story (as reflected by comparing his trial testimony summarized immediately above and his statements to the FBI on February 5 and 18, 1998).**

A **logical but necessary conclusion** (due to Garza's trial testimony) is that after February 18, 1998, Garza was confronted with the fact that the government's examination of Martinez'

---

[68] At some time before Church testified before the jury in this case on May 11, 1998, he reviewed Martinez' telephone records and found that there were no collect calls to Martinez from Mexico. 11R1484. Trial counsel deducted this from Mr. Mosbacker's representations to them on March 26, 1998, and again on April 27, 1998, that the government had no foreign records reflecting any telephone calls from Mexico to Maria Martinez, although the government was still looking for such records.

telephone records reflected a total absence of collect telephone calls from Mexico. This documentary impeachment of Garza's claims (on February 5 and February 18, 1998) that he had **always called Martinez collect** would certainly have had a devastating impact upon Garza's credibility before any rational trier of fact if he stuck to the story he related to Agents Church and Vela. Someone associated with the government **must have confronted** Garza with the existence of this damaging, impeachment evidence and Garza must have admitted that he had been mistaken (or lied) when he had spoken with the FBI on February 5 and 18, 1998 [and possibly when he gave March 31, 1993 statement and testified in his state trial on March 9, 1994]. Otherwise, there is absolutely no explanation for the government's modification of Garza's story in its bill of particulars of April 20, 1998, and no explanation as to why Garza grossly modified his testimony at trial. Any such admission should have been turned over to Cisneros counsel as exculpatory evidence (i.e., impeachment evidence), but no admission such as this was ever produced by the government.[69]

---

[69] As noted elsewhere in this motion, a motion for discovery will be filed in the near future regarding this matter.

Because of the government's non-disclosure of what had occurred to prompt Garza's massive modification of his position, as related to FBI Agents Church and Vela on February 5 and 18, 1998, Cisneros was deprived of her right and ability to:

**AA.** Develop the sequence of events that surrounded Garza's change from paragraphs **E7** and **E8** (i.e., calls to Martinez from Matamoros, Mexico, which were all collect calls) to his trial testimony (i.e., calls to Martinez from Matamoros **and San Fernando, made from casetas,** not collect calls); and

**BB.** Develop the sequence of events that surrounded Garza's change from paragraphs **E7** and **E8** (i.e., calls to Martinez from Mexico occurred between *September and November 1992,* a time frame that clearly predated the point in time that Martinez told him that the client wanted Fischer killed, to *late 1992 or early 1993*, a time frame possibly including calls after Martinez told him that the client wanted Fischer killed in late January 1993 or early February 1993).

As noted above, if these massive changes were in fact prompted by the fact that Garza was confronted with the absence of collect telephone call records by a government prosecutor or agent, and Garza admitted that he had been mistaken, previously confused, or had been less than candid, that information should have been revealed (and it was not).

85

There can be virtually no doubt that someone associated with the prosecution had to have met with Garza and confronted him with the absence of any collect telephone call records. Otherwise, there would have been no reason for Garza to have so significantly modified his story at trial (from collect calls from Matamoros in a time frame predating the murder for hire scheme **verses** calls from casetas from San Fernando and Matamoros in a time frame far more arguably consistent with the murder for hire).

The explanation regarding whether Garza had modified his story due to being confronted with the absence of any collect telephone calls being reflected in Martinez' telephone records (i.e., what prompted his modification of his story) was properly subject to production under the standards mandated by the Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963), *United States v. Bagley*, 473 U.S. 667 (1985), and *Kyles v. Whitley*, 514 U.S. 419 (1995).[69] The

---

[69] Had Garza maintained that all calls to Martinez from Mexico had been made collect, as reflected in his February 5 and 18, 1998, interviews with the government, not only would he had been destroyed on cross-examination, but if Cisneros had still been convicted, would have seriously hurt the government's chances of success on appeal. This conclusion stems from the fact that Garza, as a self-professed accomplice, would have been subject to the rule that an accomplice witness' testimony that is incredible and "entirely unsubstantial" can result in a judgment of acquittal on appeal. *See e.g., United States v. Smith*, 203 F.3d 884, 887 (5th Cir. 2000), citing *United States v. Garner*, 581 F.2d 481 (5th Cir. 1978). Under *United States v. Berma*, 30 F.3d 1539, 1552 (5th Cir. 1994), "[t]estimony is incredible as a matter of law only if it relates to facts that the witness could not possibly have observed or to events which could not have occurred under the laws of nature." Clearly, claiming to have made only collect telephone calls from Mexico to Martinez at her office or home, in the face of records proving no such calls had been made, would have probably resulted in an acquittal at trial (unless, of course, the jury believed the car crossing was related to the murder for hire scheme) and certainly would have subjected the government to a

failure of the government to proffer the explanation of how and why Garza came to grossly modify his story to Cisneros' trial counsel so that they could demonstrate to the jury the facts and circumstances that led to the inclusion of San Fernando, Mexico, in the April 20, 1998, bill of particulars and the facts and circumstances surrounding Garza's gross modification of his story on direct examination from the materials provided by the government in discovery was a due process violation.

Once Garza testified on direct examination on May 11, 1998, and modified his story to escape the obvious defensive impeachment with the absence of collect telephone calls on Martinez' home and office telephone records,[70] the government had a duty to disclose when and why he did so.

The failure to do so was undoubtedly prejudicial as depriving trial counsel of significant, additional cross-examination fodder to undermine Garza's testimony on the jurisdictional basis of the first element submitted to the jury. Given Garza's two letters to FBI Agent Barry Ross (reflected in paragraphs **E4** and **E6**), it was clear Garza was seeking concessions from the government. The government elicited from Garza on direct that there were no

---

massive problem under this doctrine on appeal.

[70] By virtue of trial counsels' inquiries to Mr. Mosbacker on March 26, 1998 (prior to the government's bill of particulars) and again on April 27, 1998 (immediately preceding the anticipated start of trial which was then scheduled for April 29, 1998), Mr. Mosbacker well knew that Garza's story of February 5 and 18, 1998, would not withstand cross-examination based on Martinez' telephone records, which had been produced to trial counsel on April 24, 1998. The situation seriously reeks of foul play at the hands of someone associated with the prosecution.

promises or deals separate and aside from non-prosecution by the federal government of the murder for hire (presumably since he had been convicted and given life in the state system), and that, in fact, it was impossible for the government to help Garza. Somehow, someway, someone associated with the government had to have prompted Garza to modify his story from his statements to FBI Agents Church and Vela on February 5 and 18, 1998. The failure to disclose this information was constitutional error as it prohibited the jury from knowing the truth, impaired and impeded Cisneros' cross-examination of Garza, and there is an overwhelming probability that had the non-disclosed information been produced to Cisneros' trial counsel, the result of the proceeding probably would have been different.

Stated differently, the sequence of events that led Garza to his gross modification of his story was critical to the defense and, regardless of the exact parameters thereof, will be favorable to the defense. Additionally, as noted above, this prevented trial counsel from making serious inroads into Garza's credibility, along the lines reflected in paragraphs **AA** and **BB** (highlighted above). The information was thus not only favorable, but material in the constitutional sense.

**CONCLUSION**

The government was under a constitutional duty to provide Cisneros with the facts and circumstances surrounding Garza's massive modification of his story, which modification occurred after February 18, 1998, and presumably before April 20, 1998, but

certainly no later than May 11, 1998.[72] Regardless of exactly when
it occurred, that gross modification came to trial counsels'
attention during Garza's direct examination on May 11, 1998.
Although trial counsel failed to inquire of the government, the
District Court and/or FBI Agent Church (on direct examination)
regarding Garza's massive modification of his story between his
last statement to the FBI on February 18, 1998, and the filing of
the government's bill of particulars on April 20, 1998 (which was
made evident by Garza's testimony on May 11, 1998, at Cisneros'
trial), the government violated Cisneros' Fifth Amendment right to
due process by not disclosing the facts and circumstances
surrounding that modification. All in all, the jury verdict is
unreliable and confidence in the outcome of the jury verdict is
totally undermined as to the foreign phone call prong of the first
element submitted to the jury. The non-disclosure had a substantial
and injurious impact upon the jury, to say the least. A new trial
should be granted, and if the Court has any doubt thereof, an
evidentiary hearing should be held to develop the sequence of

---

[72] Cisneros asserts that the government must have known that
Garza had modified his story from the versions submitted to FBI
Agents Ross and Vela on February 5 and 18, 1998, prior to hearing
Garza's testimony on direct examination. Otherwise, the government
would have been under a responsibility to have disclosed to the
District Court and Cisneros' trial counsel that Garza had committed
perjury during his direct examination (or at least corrected his
testimony to conform to what the government believed the truth to
be prior to that testimony). This was not done and thus it is
entirely logical, particularly given the government's bill of
particulars, to conclude that the government well knew prior to his
direct examination on May 11, 1998, that he would modify his story
from that which was reflected in his statements to Agents Church
and Vela in February 1998.

events surrounding Garza's departure from his version of events contained in his February 5 and 18, 1998, statements to the government, as reflected by the FBI 302's prepared by FBI Agent Church.

## CLAIM FOR RELIEF NO. 8

**CISNEROS WAS DENIED HER RIGHT TO DUE PROCESS OF LAW, AS GUARANTEED BY THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES, BY VIRTUE OF THE PROSECUTION'S USE OF FALSE TESTIMONY OF DANIEL GARZA AND THE CREATION OF A FALSE IMPRESSION FOR THE JURY UTILIZING THAT FALSE TESTIMONY**

**ASSERTION**

Based on the contents of **CLAIM FOR RELIEF NO. 7**, adopted herein by reference for purposes of brevity, Cisneros asserts that she was denied her Fifth Amendment right to due process of law by virtue of the prosecution's use of Garza's false testimony and by creating a false impression for the jury utilizing that false testimony.

**LAW**

The knowing use of false evidence or perjury violates due process and justifies a new trial if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *United States v. Agurs*, 437 U.S. 97 at 103 (1976); *Napue v. Illinois*, 360 U.S. 264 (1969); *United States v. Sutherland*, 656 F.2d 1181, 1203 (5th Cir. 1991). The same rule applies if the prosecution, although not actively soliciting false evidence, passively but knowingly allows it to go uncorrected. *United States v. Anderson*, 574 F.2d 1247, 1355 (5th Cir. 1978)(citing *Napue v. Illinois*, 360 U.S. 264 (1959). Similarly, prosecutorial misconduct violates due process if evidence is presented which "taken as a whole" gives a jury a "false impression." *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *United States v. Anderson, supra*.

91

**FACTS**

As reflected in **CLAIM FOR RELIEF NO. 6**, there is a logical conclusion that Daniel Garza's testimony at trial was false and that the prosecutors knew it was false. Additionally, there is a logical conclusion that at a minimum, a false impression was created for the jury by virtue of the utilization of Garza's gross modification of his story from that reflected in his eight (8) prior statements/letters/testimony in state court, to wit: that he actually called Martinez from Mexico, that he called from Mexico after Martinez first told him that the client wanted Fischer dead (late January 1993/early February 1993), and that she broached the topic of the "hit" during at least one of those calls.

As reflected in CLAIM FOR RELIEF NO. 7, the sequence of events surrounding Garza's gross modification of his story was not disclosed and, depending upon the discovery granted by this Court, it may become apparent that Garza had admitted he had lied and/or just got creative with the knowledge and/or assistance of the government officials who interfaced with Garza after February 18, 1998, and up to and including the date the Assistant United States Attorney got the information to insert into the government's bill of particulars, and/or up to and including the date that Garza testified at Cisneros' trial. Certainly, the situation reeks of foul play and, accordingly, this **CLAIM FOR RELIEF** has been brought in good faith, based on information and belief.

Assuming, arguendo, that Garza's testimony was false and that the government well knew it, there could be no question that relief

92

should be granted since it went to one of the two critical jurisdictional bases upon which the jury had to base its decision (and clearly the more logical one -- Garza's alleged calls to Martinez -- upon which the jury probably based its verdict based upon the gross deficiencies in the government's proof regarding the car crossing).

**CONCLUSION**

This Court should grant discovery, hold a hearing, and thereafter, grant a new trial.

## CLAIM FOR RELIEF NO. 9

**CISNEROS WAS DENIED HER RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL, AS GUARANTEED BY THE SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES, BY VIRTUE OF HER TRIAL COUNSELS' ACTS AND OMISSIONS**

**ASSERTION**

Cisneros asserts that she was denied her Sixth Amendment right to effective assistance of counsel at trial by virtue of her trial counsels' deficient and prejudicial performance, all of which operated to deprive her of a reliable jury verdict, as guaranteed by the Sixth Amendment to the Constitution of the United States.

**LAW**

The Sixth Amendment to the United States Constitution guarantees the right to the effective assistance of counsel. *See e.g., Strickland v. Washington*, 466 U.S. 668 (1984).

Generally speaking, ineffectiveness is viewed under the lens of *Strickland v. Washington*. To prevail under *Strickland*, the Supreme Court requires that:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland*, 466 U.S. at 687; *see also Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir.1994), *cert. denied*, 115 S.Ct. 1709 (1995). A defendant is prejudiced if there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. *Strickland*, *supra.* Prejudice

94

can be cumulative, however, in the sense that many small errors might infringe upon a defendant's right to effective assistance though individually they might not require reversal. *See e.g.*, *Harris v. Wood*, 64 F.3d 1432, 1438-39 (9th Cir. 1995) (discussing and applying "cumulative prejudice" analysis); *Galowski v. Murphy*, 891 F.2d 629, 639-640 (7th Cir. 1989) (same); *Kubat v. Thieret*, 867 F.2d 351, 370 (7th Cir. 1989) (same).

To make a determination regarding ineffective assistance of counsel, the proceedings as a whole must be examined, giving due consideration to the weight of the evidence supporting the verdict and evaluating the alleged failings of counsel in that total setting. *Moore v. Johnson*, 194 F.3d 586 (5th Cir. 1999).

A second category of ineffectiveness claim exists where there has been such a breakdown of the adversarial system, that prejudice becomes presumed. *See e.g.*, *United States v. Cronic*, 466 U.S. 648 (1984). This type of ineffectiveness claim stems from the fact that "the right to the effective assistance of counsel is the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Id.* at 656. Pursuant to *Cronic*, the Fifth Circuit has elaborated:

> The Sixth Amendment entitles a defendant to the assistance of counsel at all critical stages of a criminal proceeding. . . The Supreme Court has written that "[t]he Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment." The Supreme Court has recognized that there are some circumstances in which, although counsel is present, "'the performance of counsel may be so inadequate that, in effect, no assistance of counsel is provided.'"

*Tucker v. Day*, 969 F.2d 155, 159 (5th Cir.1992).

The errors described below meet the standards articulated by *Strickland* and/or *Cronic* as set out more fully below.  Cisneros' trial counsel committed a host of omissions, several of which individually entitle her to relief under *Strickland*.  Taken collectively, Cisneros trial counsel were egregiously ineffective. *Vela v. Estelle*, 708 F.2d 954, 965-966 (5th Cir.1983).[72]  Those acts and omissions, set out below, should be considered in conjunction with one another: there is a synergistic effect and therefore cumulative prejudice.  *See e.g.*, *Harris*, *supra*.  Cisneros is entitled to a new trial because trial counsels' acts and omissions were below prevailing professional norms (i.e., deficient performance) and deprived her of a fair trial as well as a reliable jury verdict, which is separately guaranteed by the Sixth Amendment to the Constitution of the United States (i.e., they were prejudicial at the guilt/innocence stage of the trial and also negated what would have otherwise been reversible error on appeal had they been properly raised). Both prongs of *Strickland* are satisfied and a new trial should be granted, as more fully explained below.

---

[72] Cisneros is aware that the standard for prejudice utilized in *Vela* was modified by the Supreme Court's decision in *Strickland*, *supra*.  However, the rationale of *Vela* is still relevant for determining whether counsel's performance fell beneath reasonable professional standards.  Likewise, the sources of prejudice articulated in *Vela* are particularly relevant to the Court's inquiry in this case.  In *Vela*, this Court noted:

> Here, Vela has identified not one error, but many, several of which were sufficiently grave to preclude review of serious claims on direct appeal.

*Id.* at 965.

**FACTS**

Cisneros asserts that there are six serious acts or omissions of trial counsel that rendered her trial fundamentally unfair and the jury verdict unreliable;[73] that these acts and omissions were deficient under prevailing professional norms; and that this deficient performance undermined confidence in the reliability of the jury verdict, in violation of the Sixth Amendment. Each of these six will be discussed below:

> **FIRST ACT/OMISSION:** Trial counsel failed to object to the government's offer of transcripts of conversations between Daniel Garza and Maria Martinez.

Based on discovery in this case (as well as their involvement in the state case) trial counsel were well aware that the government intended to attempt to introduce transcripts of tape recorded conversations between Daniel Garza and Maria Martinez which occurred in April 1993, after the date of the conclusion of the murder for hire scheme alleged in the indictment. As to Cisneros, these conversations were pure hearsay, and trial counsel knew the conversations did not fall within the co-conspirator exception to the hearsay rule.[74]

---

[73] As to two of these acts/omissions, trial counsel failed to ensure that the jury actually returned a verdict on elements of the offense of murder for hire, to wit: (1) whether Cisneros caused (in the legal sense) either: (a) Garza to call Martinez from Mexico; and (b) the car crossing on March 2, 1993; and (2) if Cisneros caused either (a) or (b) above, whether they were sufficiently related to the murder for hire scheme to justify a finding of guilty on the jurisdictional facts (i.e., whether they "facilitated" the murder for hire scheme).

[74] These conversations were not made by co-conspirators because Garza was cooperating with the state at the time of the statements. Moreover, the statements were not made during the course of and in

Consistent with what trial counsel anticipated, during the government's case in chief, the government sought to introduce these tape recorded conversations between Maria Martinez and Daniel Garza, to wit: Govt.Ex. 39 to 41. 7R329-346. These exhibits were as follows:

> 1. Govt.Ex. 39a, 39b and 39c were a conversation between Martinez and Garza on April 1, 1993, at 8:28 a.m.;[75]
>
> 2. Govt.Ex. 40a, 40b and 40c were a conversation between Martinez and Garza on April 1, 1993, at 12:20 p.m.; and
>
> 3. Govt.Ex. 41a, 41b and 41c were a conversation between Martinez and Garza on April 5, 1993, at 10:00 a.m. 7R329-346. See Def.Ex. 14 (Index to Video/Audio Tapes); 9R953-957.

When these exhibits were offered by the government, the District Court properly sustained trial counsels' objections and excluded them as co-conspirator statements because they were made after the objective of the murder for hire scheme had been accomplished; i.e., they were not hearsay and not co-conspirator statements. 7R344-346; 9R852, 944.

Later in the trial, trial counsel cross-examined Martinez by asking whether she had made specific statements to Daniel Garza (as reflected by the transcriptions of the tape recorded conversations contained within Govt. Ex. 39c, 40c and 41c). See 9R882-924. The

---

furtherance of any conspiracy because the alleged murder for hire scheme had terminated no later than March 3, 1993, as reflected in the indictment. Of course, this is without prejudice to Cisneros' position that the murder for hire scheme was complete, for purposes of limitations, when Garza made the last of the alleged foreign phone calls, which was no later than February 14, 1993.

[75] The numbering of the exhibits reflected that the a exhibit was the original tape, the b exhibit was an enhanced version of the original tape, and the c exhibit was a spanish/english transcription of the enhanced tape. See 7R329-346; 9R953-957.

defense offered no portion of the transcripts of the conversations as extrinsic evidence of a prior inconsistent statement, 9R882-924, and the only reason they were even identified for the record was in response to the government's requests for a specific date and page.

Immediately after Cisneros' trial counsel passed Martinez for redirect examination, 9R924, the government offered the entire series of exhibits relating to those three conversations. 9R924-925. Trial counsel posed no objection to the government's admission other than to state that he understood that they were being offered for "multiple purposes of impeachment." 9R924. Counsel for the government indicated that they were being offered "for purposes of rehabilitation of the witness and also for completeness of the conversations." The District Court allowed the three tapes to be introduced because trial counsel voiced **no objection**. 9R925, 944.

Accordingly because trial counsel failed to object to the government's offer of what they had previously, successfully sought to keep out of evidence, these three tapes were admitted into evidence and played for the jury (which were in spanish), while the jury reviewed the transcripts of the conversations (spanish to english translation). 9R953-957.

The failure to object was unreasonable under prevailing professional norms and constitutes deficient performance (for failing to renew the previously voiced objections to them). There was no strategic decision by trial counsel to fail to renew the previously voiced objections; merely a failure to renew previously voiced objections to the prejudicial hearsay.

99

Trial counsel subsequently recognized their deficient performance and sought to limit the jury's consideration of the tapes and transcripts of the three conversations between Martinez and Garza by submitting Requested Instruction No. 11. *See* 11R1495 at Requested Instruction No. 11.

This requested instruction cited Fifth Circuit Pattern Jury Instruction 1.10, pg. 21, as modified for the facts of this case. This instruction tracked the language of Instruction 1.10, although it specifically identified each exhibit subject to the instruction. 2R128-129. The requested instruction was not given to the jury.[76]

Under *United States v. Livingston*, 816 F.2d 184 (5th Cir. 1987); *United States v. Miller*, 664 F.2d 94 (5th Cir. 1981); and *United States v. Garcia*, 530 F.2d 650 (5th Cir. 1979), the failure to give the requested limiting instruction was harmful error. Even a cursory review of the transcripts of those three conversations reflects that absent the requested limiting instruction, the jury was allowed to "bolster" the testimony of Maria Martinez with her statements in those three conversations. It also served to "bolster" the subsequent testimony of Daniel Garza. The statements contained in the three transcripts were unadulterated hearsay that, absent the submission of Requested Instruction No. 11, could improperly be used by the jury as substantive evidence of Cisneros' guilt. The failure to give the requested instruction was reversible

---

[76] The failure to submit Requested Instruction No. 11 was raised on direct appeal. Both vacated panel opinions addressed this issue and held that the tapes had been introduced for all purposes; accordingly, the limiting instruction was not necessary.

error.

However, since trial counsel failed to renew their previous objections to the three tapes, the District Court's refusal to submit the limiting instruction contained within Requested Instruction No. 11 was held to be proper in both vacated panel opinions. Accordingly, it is clear that but for counsel's failure to object to the admissibility of the tapes, the jury was allowed to consider, as substantive evidence of Cisneros' guilt, hearsay evidence that was clearly not admissible had trial counsels' earlier objections been renewed. This was prejudicial to Cisneros' rights to a reliable jury verdict, as the unadulterated hearsay was not reliable, in part because at the time of the tapes, Garza was effectively acting as an agent of the State of Texas and was attempting to obtain incriminating admissions from Martinez while being given cart blanche by the State of Texas.

A new trial should be granted as the jury's consideration of massive, unreliable hearsay that was not admissible except for the absence of a renewed objection undermines confidence in the verdict. As such, trial counsels' unreasonable failure to object was prejudicial.

**SECOND ACT/OMISSION**: Trial counsel failed to cross-examine Maria Martinez concerning the fact that she was aware that Daniel Garza had called her from Dallas and San Antonio, but had never been called by Daniel Garza from Mexico, as established by Martinez' prior testimony and her statement to FBI Agent Church on January 28, 1998, and/or develop the fact that Garza had previously told Martinez that he was calling her from Dallas and San Antonio, not Mexico.

The key issue in this case was whether there was federal jurisdiction. Trial counsel was well aware of this key issue and, accordingly, filed a motion for bill of particulars addressing the alleged foreign commerce. In response, the government voluntarily filed a bill of particulars. Thus, the indictment, as amplified by the government's bill of particulars, established two potential jurisdictional basis which would be critical at trial: (1) Garza's alleged calls from Mexico to Martinez in Brownsville (which as subsequently conceded by the government, all would have occurred prior to February 14, 1993); and (2) the car crossing on March 2, 1993. This section of this **CLAIM FOR RELIEF** deals only with the first jurisdictional basis, the alleged calls by Garza from Mexico.

Regarding the alleged calls from Garza, trial counsel had Martinez' prior state court testimony to utilize in an effort to deflect the alleged foreign telephone calls from Garza. From that state court testimony, Cisneros' trial counsel were well aware that Martinez had previously testified in the state court litigation that **Garza had called her from Dallas and San Antonio: she never claimed that Garza had ever called her from Mexico.** *See* **Exhibit 2** at 1434-1441.

From discovery in this case, trial counsel were aware from an FBI 302 (memorandum of interview) that on August 29, 1996, Maria

102

Martinez had related to FBI Agents Barry Ross and Jorge Cisneros that Garza had called Martinez on numerous occasions, but Martinez did not discuss with them the locations from which Garza had allegedly called her. *See* **Exhibit 3.**

Similarly, from discovery in this case, trial counsel were aware from an FBI 302 (memorandum of interview) that on January 28, 1998, Maria Martinez had related to FBI Agents David Church and Freddy Vela that Garza had told Martinez during their telephone calls that he (Garza) was calling from Dallas and San Antonio, that Garza called Martinez collect every time he called her, and that Martinez was unaware of any telephone calls made to her by Garza that originated from outside of the State of Texas or from Mexico. *See* **Exhibit 4**.

During the direct examination of Martinez, the government never asked Martinez if Garza had ever called her on the telephone. *See* 8R720-740; 9R864-881.

On cross-examination, trial counsel did not inquire about any telephone calls from Garza to Martinez. See 9R881-924.

On neither redirect, 9R924-929, or on re-cross, 9R929-930, was the topic of whether Garza had ever called Martinez broached by either side. However, trial counsel asked the District Court to continue to keep Martinez available as a witness for further cross-examination. 9R930-931.

Thus, trial counsel failed to cross-examine Martinez and elicit testimony from her that Garza had only called her from Dallas and San Antonio, not from Mexico, and that Garza had always

103

called her collect.

Trial counsels' failure to cross-examine Martinez[77] was not the result of any strategic decision and was unreasonable under prevailing professional norms. This is all the more apparent when the testimony of Daniel Garza is considered.

As noted above, Garza testified he called Martinez from Mexico on four occasions and that on at least one of those, Martinez broached the topic of whether he had found a hit man, but he (Garza lied about it. 11R1366-11R1368.

These conversations, to relate to the murder for hire scheme, would have had to have occurred after end of January 1993 or in early February 1993, as it was the end of January or early February 1993 that Martinez told Garza, for the first time, that her client wanted the boy dead. 11R1362-1363. Prior to that time (October 1992, approximately), Martinez had asked him about having the boy beaten up, but not killed. 11R1360-1362. Of course, Garza never told the people he arranged to do the job to kill Fischer, just to beat him up, 11R1438-1439, and before March 2, 1993, Garza never believed that anyone was going to kill Joey Fischer. *Id.*

Garza testified that the four calls he made from Mexico to Martinez in Brownsville were all made in late 1992 or early 1993. 11R1366. The calls were all placed by Garza to talk to Martinez about his personal affairs, but according to Garza, she inquired of

---

[77] This cross-examination should have occurred during Martinez' testimony when the government put her on the stand or, at the very least, trial counsel should have recalled her to the stand after Garza's testimony was adduced by the government.

104

him on at least one of the calls about the job and he lied to her by telling her that he had found someone to "knock down the roof on the house and put it back up.".11R1367-1368.

Garza further testified that although he might have called Martinez collect once from Mexico, the FBI was mistaken if they wrote down that he had always called collect from Mexico to her, 11R1398-1399, and added that he actually called Martinez from phone booths or casetas and had not kept the receipts he had obtained. 11R1402-1405.

Cisneros' trial counsel properly called FBI Agent David Church to impeach Garza's trial testimony. According to Church, Garza had hold him that all calls from Mexico to Martinez had been made collect and that he (Church) had checked Martinez' telephone records and had been unable to locate even one collect call from Mexico. 11R1483-84

As noted above, from Martinez' testimony in the state case, there was powerful evidence to contradict Garza's testimony about calls from Mexico, to wit: that after **Halloween 1992**, the only calls that Martinez received from Garza were as follows:

> 1. In December 1992, Garza called her from Dallas, at which time he had not been able to come or do anything yet. *See* **Exhibit 2** at 1434.

> 2. In January 1993, Garza called her once from Dallas, at which time he did not say anything other than that he was busy and that he would come to Brownsville. *See* **Exhibit 2** at 1437.

> 3. In February 1993, Garza called her twice; once when he said "I'll be there any moment now" (and nothing else, referring, obviously, to the fact that he was going to stop by Martinez' business and was calling from Brownsville), and again from Dallas. *See* **Exhibit 2** at 1439-1442.

4. On March 3, 1993, Garza called her and told her he was coming over to pick up the money (obviously from Brownsville). *See* **Exhibit 2** at 1442.

Furthermore, as noted above, trial counsel were aware from an FBI 302 (memorandum of interview) that on August 29, 1996, Maria Martinez had related to FBI Agents Barry Ross and Jorge Cisneros that Garza had called Martinez on numerous occasions, but Martinez did not discuss with them the locations from which Garza had allegedly called her. *See* **Exhibit 3.**

Additionally, as noted above, FBI Agent Church interviewed Maria Martinez on January 28, 1998, and a memorandum of that interview, prepared by Agent Church, was provided to the defense during discovery. That memorandum also provided powerful evidence to contradict Garza's testimony about calls from Mexico, to wit:

> "Martinez recalled four to five conversations, by telephone, with Garza in which he inquired why "La Clienta" (Cisneros) was taking so long to get Martinez the picture of Joey Fischer for the hitmen. Martinez stated that these calls were placed from Dallas and San Antonio, Texas, according to Garza. Garza also called Martinez collect every time he contacted her by telephone. Martinez advised that she was unaware of any telephone calls made to her by Garza or Cisneros that originated outside of the State of Texas or from Mexico. Martinez added that she did not make any calls to Garza or Cisneros from outside the State of Texas or from Mexico."

*See* **Exhibit 4.**

Given Garza's testimony, and even considering FBI Agent Church's testimony (contradicting and impeaching Garza's testimony), Cisneros' trial counsel should have utilized Martinez' state trial testimony to bolster the defensive platform that Garza was lying when he claimed to have called Martinez from Mexico.

Similarly, Cisneros' trial counsel should have utilized Martinez' statements to Church (as reflected in Church's memorandum of interview from January 28, 1993) to bolster the defensive platform that Garza was lying when he claimed to have called Martinez from Mexico.

This could have been done by cross-examining Garza about whether he had told Martinez where he was calling from during each of the months in question, and then, if Garza denied telling Martinez that he was calling from Texas, calling Martinez to testify that Garza had told her during those telephone calls that he was calling from Dallas or San Antonio, not Mexico. Similarly, Cisneros' trial counsel could have accomplished this same end by simply cross-examining Martinez on the topic, and if she deviated from her state trial testimony or Agent Church's rendition of what she had told him, defense counsel could have used her state trial testimony to impeach her and/or called Agent Church to testify about her statements to him (as defense counsel did with Agent Church vis a via Garza's testimony).

Either way, had defense counsel used Martinez' state trial testimony or her statements to Agent Church, the impact upon the jury would have been far stronger. It should be recalled that there was absolutely no physical evidence to substantiate Garza's claim that he had called from Mexico. In fact, FBI 302's (memoranda of interviews) reflect the following contact with Garza and his comments regarding telephone calls:

> 1. On June 28, 1996, Garza was interviewed by FBI Agents Barry Ross and Jorge Cisneros. *See* **Exhibit 8**. No calls

107

from Mexico were mentioned.

**2.** On September 30, 1996, FBI Agent Ross received a letter from Garza, dated September 2, 1996. No calls from Mexico were mentioned, although Garza indicated his willingness to assist if certain conditions of cooperation could be met. *See* **Exhibit 9**.

**3.** On November 22, 1996, Garza was interviewed by FBI Agents Barry Ross and Jorge Cisneros. No calls from Mexico were mentioned. *See* **Exhibit 10**.

**4.** On December 9, 1996, Special Agent Ross received a letter from Garza, dated December 3, 1996. No calls from Mexico were mentioned, although Garza indicated his willingness to assist if certain conditions of cooperation could be met. *See* **Exhibit 11**.

**5.** On February 5, 1998, Garza was interviewed by FBI Agents David Church and Freddy Vela. This memorandum of interview reflects the following:

> "Garza advised, before Fischer was murdered, he would call Martinez quite often regarding his martial problems. According to Garza, during every phone conversation, Martinez would ask about the job to kill Fischer. Garza stated Martinez would refer to the job as a "roof job". Garza recalled making several calls to Martinez from public telephones in Matamoros, Mexico, and each time Martinez referred to the "roof job" by asking when Garza would find someone to do the job. Garza also advised he would always call Martinez collect." *See* **Exhibit 12**.

**6.** On February 18, 1998, Garza was interviewed by FBI Agents David Church and Freddy Vela. This memorandum of interview reflects the following:

> " Garza advised he made telephone calls from Matamoros, Mexico, using public telephones between September and November 1992, to call Maria Martinez. According to Garza, these calls were all collect calls. Garza could not recall where the public telephones he used in Matamoros were located." *See* **Exhibit 13**.[78]

---

[78] It should be noted that no FBI 302's of any interview with Garza after the interview of February 18, 1998, were produced to Cisneros' trial counsel, presumably because Garza was not

At some time before Church testified before the jury in this case on May 11, 1998, he reviewed Martinez' telephone records and found that there were no collect calls to Martinez from Mexico. 11R1484.

According to Agent Church's February 23, 1998, grand jury testimony at pages 32-33 (the very day that Cisneros was indicted in this case), Martinez' home number in 1992 to 1993 was 210-544-6319 (although the area code had changed from 210 to 956). In fact, the records responsive to a grand jury subpoena previously issued for the subscriber and toll records for Martinez' home telephone number were returned to the grand jury by Church that very day, February 23, 1998.

Although not reflected by the grand jury testimony of Agent Church, the government had also subpoenaed, on November 24, 1997, the subscriber information and toll records for Maria Martinez' store at 713 E. 11th Street (210-546-8137) for the time frame of

---

interviewed after February 18, 1998. Thus, as of the last known interview with Garza on February 18, 1998, Garza had only mentioned calling Martinez from Matamoros, Mexico, collect, and during a time frame that predated Martinez' statement to him that the client wanted Fischer dead (as opposed to merely hurt or beaten up).

Interestingly, on April 20, 1998, the government's bill of particulars included the allegation that Garza had called Martinez not just from Matamoros, but also from San Fernando, Mexico. Where, exactly, this information came from is a mystery, as was his trial testimony that he did not call collect, but rather from casetas, unless of course Garza was confronted with the fact that the government's examination of Martinez' telephone records reflected a total absence of collect telephone calls from Mexico. If this occurred, then Garza would have had to have admitted that he had lied to the FBI on February 5 and 18, 1998. Such an admission should have been turned over to Cisneros defense counsel, but no admission such as this was ever produced by the government. *See* **THIRD ACT/OMISSION** and **FOURTH ACT/OMISSION**, both *supra* in this **CLAIM FOR RELIEF**, as well as **CLAIM FOR RELIEF NO. 7** (raising non-disclosure of this as a due process claim).

109

October 1, 1992 to May 31, 1993. These records were subpoenaed to be returned prior to December 9, 1997. They were in fact faxed by Southwestern Bell to the government on December 3, 1997. *See* **Exhibit 14**.

Although defense counsel did not have notification from the prosecution that Church had been unable to locate any collect telephone calls on Martinez' telephone records, these telephone records were obtained from the government in discovery and upon inspection, did not reflect any collect telephone calls to Martinez from Mexico.[80]

Accordingly, Cisneros' trial counsel developed via Agent Church that Garza had in fact told him on or about February 5, 1998 and again on or about February 18, 1998, that he had always called Martinez collect from Mexico. Cisneros' trial counsel also extracted from Agent Church that his inspection of Martinez' telephone records failed to reflect any collect calls from Mexico.

Given the above, there was absolutely no strategic reason not to have utilized Martinez' state court trial testimony and her statements to the FBI to buttress the defensive platform that Garza was lying about telephone calls from Mexico. This was simply an unreasonable oversight by trial counsel.

This omission clearly fell below prevailing professional norms and was unreasonable. Trial counsel clearly should have utilized

---

[80] It should be noted that on March 26, 1998, and again on April 27, 1998, Mr. Mosbacker responded to inquiries from trial counsel and disclosed that the government had no foreign records reflecting any telephone calls from Mexico to Maria Martinez, although the government was still looking for such records.

the available materials to undermine Garza's claim that he had called from Mexico. There was absolutely no strategic reason to fail to do so.

The failure to do so also undermines confidence in the outcome of the trial because Garza's contemporaneous statements to Martinez in 1992/1993 that he was calling from Dallas or San Antonio (as opposed to Mexico) occurred during the actual telephone calls and were at a date when he had absolutely no reason to lie about where he was calling from. On the other hand, in 1998, Garza had every reason in the world to fabricate about calling from Mexico since he wanted everyone involved to pay for the crime, 11R1355, and he knew that Cisneros had been acquitted on appeal in state court.

Moreover, Martinez had no reason to lie to FBI Agent Church about Garza calling collect every time he called her. She was the person accepting the collect telephone calls; the fact that FBI Agent Church was unable to locate any collect telephone calls **from Mexico** does not contradict the fact that Garza called Martinez collect **from Dallas and San Antonio**: Church was simply not asked whether there were collect calls to Martinez from San Antonio and/or Dallas.

Under, *inter alia*, *Nixon v. Newsome*, 888 F.2d 112 (11th Cir. 1989), *Smith v. Wainwright*, 741 F.2d 1248 (11th Cir. 1984), and *Moffett v. Kolb*, 930 F.2d 1156 (7th Cir. 1991), the issue of ineffective assistance of counsel due to a failure to cross-examine and impeach, outlined above, is meritorious. The cross-examination would have explored areas upon which neither Martinez nor Garza

111

were cross-examined upon and would have rendered Garza's testimony regarding the jurisdictional basis (foreign telephone calls) contained within the first element submitted to the jury far from credible.

A new trial should be granted due to trial counsels' failures, as outlined above. While it is obviously impossible to determine if in fact the jury would have acquitted had trial counsel utilized Martinez' state court testimony and her statements to FBI Agent Church, the failure to utilize those two fertile sources of information seriously undermines confidence in one of the two jurisdictional bases (i.e., telephone calls). Since the jury asked if they had to find both, as opposed to one, jurisdictional basis during its deliberations, there is a reasonable probability that the result of the trial would have been different, but for counsels' unreasonable conduct. Thus, prejudice is shown.

112

**THIRD ACT/OMISSION:** Trial counsel failed to cross-examine Daniel Garza with his prior inconsistent statements, his lack of prior consistent statements and the contents of Martinez' prior testimony and statements.

As reflected above in connection with the **SECOND ACT/OMISSION** contained in this **CLAIM FOR RELIEF**, the key issue in this case was whether there was federal jurisdiction. Trial counsel was well aware of this key issue and, accordingly, filed a motion for bill of particulars addressing the alleged foreign commerce. In response, the government voluntarily filed a bill of particulars. Thus, the indictment, as amplified by the government's bill of particulars, established two potential jurisdictional basis which would be critical at trial: (1) Garza's alleged calls from Mexico to Martinez in Brownsville (which as subsequently conceded by the government, all would have occurred prior to February 14, 1993); and (2) the car crossing on March 2, 1993. This section of this **CLAIM FOR RELIEF** deals only with the first jurisdictional basis, the alleged calls by Garza from Mexico.

As part of this **THIRD ACT/OMISSION**, Cisneros incorporates by reference the immediately preceding **SECOND ACT/OMISSION** as it would relate to the failure to adequately cross-examine Daniel Garza with questions designed to confront him with the fact that Maria Martinez' prior testimony and statements reflected that Garza had told her that he was calling from San Antonio and/or Dallas, not Mexico.

In addition to what is reflected in the **SECOND ACT/OMISSION**, Cisneros' trial counsel also had extensive prior statements and prior testimony from Garza which should have been used to cross-

113