the District Court's overruling of the objections) fell below prevailing professional norms and was prejudicial to Cisneros. While appellate counsel raised the denial of Cisneros' Requested Instruction No. 12 ("in furtherance"), appellate counsel did not argue that the denial of an appropriate instruction constituted a due process violation and that the District Court's action in overruling trial counsels' objections, as indicated above, also constituted a due process violation. This was a mere oversight by appellate counsel, not a strategic decision.

Clearly, the absence of an appropriate instruction on this critical issue was important to a reliable jury verdict. Cisneros' appellate counsel raised one shade or phase of this issue, but unreasonably neglected to raise the other side of the issue: the District Court's improper action in overruling objections and failing to submit an instruction, regardless of the language requested by Cisneros' trial counsel.

It should be remembered that as reflected by trial counsel's final argument at 12R1561-1574, this was in fact the penultimate issue for the jury's consideration: whether the alleged calls from Garza to Martinez from Mexico or the car crossing was sufficiently related to the murder for hire scheme to justify a finding of guilt. When the District Court denied Cisneros' requested instruction and her objections, there was absolutely no reason not to raise both sides of the equation on appeal. Indeed, there was no strategic reason for appellate counsels' failure to raise as an issue the District Court's action in overruling Cisneros'

154

argue to the jury that the foreign commerce did not have to be related to the murder for hire scheme. See 12R1529, 1575.[112]

When a jury is allowed to convict a citizen without an instruction on every element of the offense, a denial of the Fifth and Sixth Amendments exist. *See United States v. Gaudin*, 515 U.S. 506, 509-511 (1995):

> The Fifth Amendment to the United States Constitution guarantees that no one will be deprived of liberty without "due process of law"; and the Sixth, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." We have held that these provisions require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt. *Sullivan v. Louisiana*, 508 U.S. 275, 277-278, 113 S.Ct. 2078, 2080-2081, 124 L.Ed.2d 182 (1993). (footnote omitted).

Here, that is exactly what occurred. The jury obviously had some problems with the jurisdictional issue, because it inquired of the District Court. The District Court then informed the jury that it had to merely find one of the two jurisdictional basis: either foreign telephone calls or foreign travel.[113]  However, the jury

---

[112] The District Court's instruction on foreign commerce was clearly deficient. Although the evidence was insufficient to show that any foreign phone calls or travel furthered or facilitated the murder, the jury was permitted to ignore this insufficiency and convict Cisneros on the basis of phone calls and travel **not connected to the murder**. Moreover, the District Court's instruction on foreign commerce also allowed the jury to convict on facts broader than the indictment (i.e., the indictment, as amplified by the government's bill of particulars, alleged that Heriberto Pizana travelled in foreign commerce and that Daniel Garza used telephone facilities to call from Mexico to Brownsville).  This in essence constituted a constructive amendment of the indictment.

[113] This was the critical issue and, unlike those cases where the failure to submit materiality to the jury was deemed harmless error, the issue of whether the foreign commerce was related to the

156

was not required to find that either or both of the jurisdictional bases were related to the murder for hire scheme, thus depriving Cisneros of a jury verdict that included the penultimate element of the offense of murder for hire.

The failure to raise the District Court's improper overruling of Cisneros' objections should have been raised on appeal. The failure to do so was unreasonable and prejudicial. A new appeal should be granted or the case remanded for a new trial.[114]

---

murder for hire scheme was hotly contested and there was not overwhelming evidence that either jurisdictional basis was established. The failure to require the jury to thus find that either or both jurisdictional bases were related to the murder for hire scheme was thus harmful to Cisneros.

[114] A new trial should be granted so that an appropriately instructed jury can ascertain whether either or both of the foreign commerce aspects (i.e., Garza's calls and/or the car crossing) was sufficiently related to the murder for hire scheme to justify a finding of guilt. Otherwise, appellate counsel's deficient performance in this regard will have sanctioned a due process violation.

**SECOND ACT/OMISSION:** Appellate counsel failed to raise and/or adequately raise as an issue on appeal the District Court's improper overruling of Cisneros' objections to the failure to instruct the jury that it had to find that the foreign commerce (i.e., Garza's alleged calls from Mexico to Martinez and the crossing of the vehicle) were actually caused by Cisneros.

This portion of this **CLAIM FOR RELIEF** also relates to **CLAIM FOR RELIEF NO. 6** as well as **CLAIM FOR RELIEF NO. 9 (Sixth Act/Omission** therein), both of which are adopted herein for purposes of brevity. Additionally, **CLAIM FOR RELIEF NOS. 1 to 5** also relate to this **CLAIM FOR RELIEF** and this **CLAIM FOR RELIEF** should be considered in light thereof.

The issue of causation was recognized by trial counsel. Trial counsel thus requested an instruction, Requested Instruction No. 15A, seeking to instruct the jury on causation, as follows:

A person "causes" another to travel in foreign commerce or to use facilities in foreign commerce if he does an act with knowledge that the foreign travel or use of facilities in foreign commerce will follow in the ordinary course of business, or where such foreign travel or use of facilities in foreign commerce can reasonably be foreseen, even though not actually intended.

2R140.[115] The District Court did not inquire of the government's position regarding this requested charge. Rather, the District Court just denied it, to which Cisneros objected. 11R1520-1522, 12R1599. As such, the court gave the jury no guidance on the first element of the offense, as contained in the court's instructions, to wit:

---

[115] The requested instruction was taken from *United States v. Sneed*, 63 F.3d 381 at 385 n.4 (5th Cir. 1995), quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954).

First: That the defendant caused another to travel in foreign commerce or caused another to use a facility in foreign commerce; 11R1502 at 1516; 2R93.

As noted by the District Court, Cisneros objected to everything that was inconsistent with her requested jury instructions. 11R1499-1500, 1520-1521.[116]

As reflected in the preceding footnote, supra, the District Court's failure to submit an instruction on causation, as requested by Requested Instruction No. 15A, was raised on appeal (as was his theory of defense instruction, which also contained language making clear that a charge on causation should be given).

Both vacated panel opinions reflect that the requested instruction was not substantially accurate and therefore, properly denied by the District Court. Neither of the vacated panel opinions nor the en banc opinion address the District Court's failure to charge the jury on the law relative to "causation", the first element submitted to the jury.

_____

[116] In Cisneros' brief, the issue of the denial of her Requested Instruction No. 15A was raised as part **E** of **ISSUE NO. 3**. Although Cisneros' appellate counsel did not separately raise her objection to the District Court's language on foreign commerce, appellate counsel did include the following in part **E** of **ISSUE NO. 3**:

> "Essentially, the failure to give the requested instruction allowed the jury to convict without a unanimous verdict as to what the term "caused" meant. This is the essence of a due process violation. A new trial should be ordered."

The failure to submit any instruction on causation was also raised in Cisneros' motions for rehearing from both vacated panel opinions, as well as in her en banc supplemental brief, but the utter failure to have the jury instructed on causation was not addressed by the Fifth Circuit. It was also raised on certiorari.

159

The failure to raise on appeal the absence of an instruction on the requirement of causation (i.e, that Cisneros was the cause in fact and the proximate cause[117]) as it related to the alleged foreign commerce (Garza's alleged telephone calls from Mexico to Martinez and the car cross) and the District Court's overruling of the objection to everything that was inconsistent with what the District Court did not charge upon that was requested by Cisneros) fell below prevailing professional norms and was prejudicial to Cisneros.

Indeed, while appellate counsel raised the denial of Cisneros' Requested Instruction No. 15A, appellate counsel did not argue that the denial of an appropriate instruction constituted a due process violation and that the District Court's action in overruling trial counsels' objection, as indicated above, also constituted a due process violation. This was a mere oversight by appellate counsel, not a strategic decision.

Had it been raised on appeal, the prejudice from the denial would have focused on the fact that trial counsel were not able to argue that Cisneros had not "caused" the alleged foreign commerce to have occurred, as reflected by the legal standard which should have been included in the jury instructions, so as to mandate a finding of "not guilty".

The jury was not instructed on the legal requirements of causation. Thus, the jury had no guidance on causation, a key

---

[117] "Causation in criminal law has two requirements: cause in fact and proximate cause." *United States v. Spinney*, 795 F.2d 1410, 1415 (9th Cir. 1986) (citations omitted).

component of the first issue the jury had to consider in ascertaining whether Appellant had committed a crime. Essentially, the failure to give the requested instruction or otherwise submit an explanation of causation allowed the jury to convict without a unanimous verdict as to what the term "caused" (as contained in the first element of Section 1958) meant. This is the essence of a due process violation. *United States v. Gaudin, supra. See also* **CLAIM FOR RELIEF NO. 6** (addressing the due process problems associated with the absence of a complete instruction on causation, adopted herein by reference for purposes of brevity); **CLAIM FOR RELIEF NOS. 1 to 5** (addressing insufficiency of evidence regarding causation and foreign commerce nexus to murder for hire scheme).

The absence of an instruction on causation was prejudicial to both jurisdictional basis (Garza's telephone calls from Mexico and the car crossing on March 2, 1993), as it is entirely unclear that either of them were "caused" by Cisneros, in the legal sense. As reflected in Cisneros' motions for rehearing from both vacated panel opinions as well as her supplemental en banc brief and petition for writ of certiorari, something more than "but for" causation or "foreseeability" is legally required.

The second vacated panel concluded that *United States v. Edelman*, 873 F.2d 791 (5th Cir. 1989), governed and only required the government to prove "simple 'but for' causation rather than foreseeability" in order to establish the causation aspect of the foreign commerce requirement in § 1958 (a). This interpretation of *Edelman* misapplied a conspiracy case to a straightforward murder-

161

for-hire case and is prohibited by *Rewis v. United States*, 401 U.S. 808 (1971).

Reviewing 18 U.S.C. § 1958 in light of 18 U.S.C. § 1952 (the Travel Act) is appropriate. *Edelman*, 873 F.2d at 794. The Supreme Court's decision in *Rewis* defines the parameters of the nexus between the interstate/foreign commerce and the underlying offense for purposes of the Travel Act and, by extension, the murder-for-hire statute, by interpreting Congressional intent through the rule of lenity. 401 U.S. at 811-12. The Supreme Court held in *Rewis* that reading "foreseeability" into the statute violated Congressional intent by making it too easy for the government to establish a nexus. *Id.* at 813. "Congress" provided "little, if any, evidence that [it] intended that foreseeability should govern criminal liability under § 1952." *Id.* at 813. For the sake of comity, Congress intended that the proof demonstrate, if not intent, something more than "but-for causation" **and** "foreseeability" in order to prevent expansive interpretation of the interstate/foreign nexus that would swallow up state law offenses and state jurisdiction.

The second vacated panel's "but-for causation" rule violates the principle oft-repeated throughout the Supreme Court's commerce clause jurisprudence, in addition to *Rewis*, that Congress may not create a jurisdictional "element," such as the interstate/foreign commerce nexus in §§ 1952 and 1958, that does not meaningfully limit federal power, **especially** "in areas such as criminal law enforcement . . . where States historically have been sovereign."

162

*United States v. Lopez*, 514 U.S. 549, 561, 564 (1995). By creating its "but-for causation" model, the second vacated panel, in the words of Judge Learned Hand, formed "a view of causation that would obliterate the distinction between what is national and what is local in the activities of commerce." *Lopez*, 514 U.S. at 567 (quoting cases). This is particularly egregious in light of the fact that this was an intrastate offense that the government attempted to transform into a federal offense (as demonstrated by the fact that Cisneros was previously acquitted in state court for the substantive offense of the murder of Fischer).

Moreover, every Section 1952, 1952A, and 1958 case of which counsel is aware in which the defendant was directly charged, as opposed to charged as a coconspirator or aider and abettor,[118] makes explicit or implicit findings regarding whether the **defendant intentionally or knowingly**[119] **caused** the travel or use of

---

[118] *Edelman*'s treatment of causation would apply to Cisneros' case only if she had been charged with conspiracy. Like *Edelman*, *United States v. Perrin*, 580 F.2d 730 (5th Cir. 1978), and *United States v. Razo-Leora*, 961 F.2d 1140 (5th Cir. 1992) are inapplicable to Cisneros' case to the extent that they also are based upon conspiracy charges and convictions. Because the *Edelman* jury was charged with conspiracy, it could automatically find Edelman **vicariously liable** for the act of coconspirator Young sending a letter through the mail to Zabitosky. *Edelman*, 873 F.2d at 792. This cannot be said of Garza and Martinez, because the jury was not charged with finding that they were co-conspirators with Appellant. Without the conspiracy charge, their actions had to be more substantially tied to Cisneros than through her possible foresight of those actions.

[119] The cases rely upon "intent" or "knowledge" to establish the jurisdictional nexus. The point, however, is that something more than foreseeability is required and the jury must be charged with finding something more than foreseeability. Otherwise, a conviction can be obtained without any jury finding that the defendant actually caused the foreign commerce, which would run

163

interstate facility. This involves the defendant herself travelling, using the facility, or an agent travelling or using the facility under the defendant's direction, and at least with her knowledge that the interstate facility is being used to further the offense. *See, e.g., United States v. Finley*, 175 F.3d 645, 646 (8th Cir. 1999) (defendant personally put stamps on letters that were mailed)); *United States v. Weathers*, 169 F.3d 336, 344 (6th Cir. 1999) (defendant's numerous cell-phone conversations); *United States v. Garrett*, 716 F.2d 257, 265 (5th Cir. 1983) (defendant instructed codefendant to make an interstate phone call); *United States v. Pecora*, 693 F.2d 421, 424 (5th Cir. 1982) (phone call by defendant in Georgia to sheriff in Louisiana); *United States v. Jones*, 642 F.2d 909 (5th Cir. 1981) (defendant travelled between states to cash wagering checks); *United States v. Perrin*, 580 F.2d 730; 735 (5th Cir. 1978) (defendant, on instructions from co-defendants, made interstate telephone calls); *United States v. Archer*, 486 F.2d 670, 683 (2d Cir. 1973) (defendant's *receipt* of a phone call from Paris, France, in no way initiated by the defendant, although expected by him, was insufficient to establish nexus); *United States v. Kahn*, 472 F.2d 272, 285 (2d Cir. 1973) (finding nexus based upon extensive interstate travel and use of mails, distinguishing *Rewis* on basis that defendants there did not engage in interstate activities themselves and interstate travel was marginal or unforeseen). In *Marek*, for example, Marek

---

afoul of the Supreme Court's pronouncement in *United States v. Gaudin, supra,* that the jury must find every element of the offense beyond a reasonable doubt.

personally delivered $500 to Western Union in Houston for transfer to the undercover agent in Harlingen.  *Marek*, 198 F.3d 532 (5th Cir. 1999).

Given this backdrop, the failure of appellate counsel to raise the absence of an instruction on causation and the District Court's overruling of her objection was unreasonable and prejudicial. Had the denial of any instruction on causation/the overruling of Cisneros' objection been raised on appeal, there is a reasonable probability that the result of the appeal would have been different (a new trial should have been granted).

The failure to do so allowed a conviction to be upheld when the jury had never determined one of the essential elements of the offense contained in the indictment (and Section 1958) without any guidance. As such, the jury verdict on the first issue -- causation of foreign commerce -- is not reliable and prejudice is apparent.

165

**THIRD ACT/OMISSION**: Appellate counsel failed to raise as an issue on appeal the District Court's improper overruling of Cisneros' motion to dismiss the indictment due to misconduct occurring before the grand jury.

The pretrial hearing in this case was held on April 27, 1998. A portion was held prior to the noon recess ("first portion") and a portion was held after the noon recess ("second portion").

During the first portion, Mr. Mosbacker made certain representations regarding the assertion that he had used two different grand juries (one in Brownsville and one in Houston), the transfer of the case from the Brownsville grand jury to the Houston grand jury, the issuance of grand jury subpoenas, and the existence and contents of a Rule 6e disclosure order. During this first portion of the pretrial, the Court also ordered the disclosure of the testimony of the sole witness who testified before the Houston grand jury (i.e., FBI Agent David Church)

During the second portion of the pretrial hearing, Mr. Mosbacker made additional representations and was questioned by Mr. Canales. Disclosure of the testimony of the sole witness who testified before the Houston grand jury (FBI Agent David Church) was provided (to Cisneros' trial counsel), although the date of the testimony was not reflected on the transcript.

On the morning of April 29, 1998, Cisneros filed her "Motion To Dismiss The Indictment Due To Violations Of Rule 6, F.R.C.P., And The Submission Of Grossly Inaccurate And Misleading Testimony And Information To The Grand Jury Which Returned The Indictment And Brief In Support." 2R208-223.

The motion was addressed that same day during a further

166

pretrial hearing. During the hearing, a copy of FBI Agent Church's testimony was introduced into the record (sealed), and the Court ordered the government's Rule 6 disclosures put into the record. As noted at that time, Cisneros' Pretrial Exhibits 28, 28-A and 28-B[120] (introduced during the April 27, 1998, pretrial hearing) were to be considered in conjunction with the motion. Pretrial Hearing (4/29/98) at 5. The government also put on the record that the transcript of FBI Agent Church's testimony, which was undated on the cover, had actually occurred on the same date that the grand jury returned the indictment (i.e., February 23, 1998). Pretrial Hearing (4/29/98) at page 6.

The District Court then denied the motion (without seeking any response from the government on or off the record). Pretrial Hearing (4/29/98) at 5; 1R227.

On appeal, the denial of this motion was not raised by appellate counsel. This was a gross oversight by appellate counsel. Cisneros asserts (and appellate counsel concede) that the failure to raise this issue on appeal was unreasonable under prevailing professional norms.

---

[120] These three pretrial exhibits were the "grand jury subpoenas" that the government had issued in connection with obtaining telephone records. As reflected by those subpoenas (as well as Agent Church's grand jury testimony itself), they were subpoenas for the telephone records of Maria Martinez and Daniel Garza. Documents responsive to two of those subpoenas had been returned prior to Agent Church's February 23, 1998, grand jury testimony, and documents responsive to the third were in Agent Church's possession at the time of his grand jury testimony on February 23, 1998. See Grand Jury Testimony at page 32-33. Thus, the entire set of telephone records relating to Maria Martinez and Daniel Garza were available prior to the return of the instant indictment herein.

167

Regarding whether the failure to raise the issue was prejudicial, recourse to the motion and arguments which would have been raised on appeal are necessary.

The motion to dismiss was based on two different prongs: (1) violations of Rule 6 and the abuse of the grand jury and grand jury subpoena power that occurred; and (2) the content of the testimony by the sole witness who testified before the Houston grand jury that returned Cisneros' indictment (i.e., misleading testimony of Special Agent David Church).

Each of these will be addressed separately.

**A. RULE 6 VIOLATIONS, ABUSE OF THE GRAND JURY AND GRAND JURY SUBPOENA POWER.**

The powers of a federal grand jury has been described as follows:

> "Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry. **The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate**, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials.
>
> * * *
>
> "The scope of the grand jury's powers reflects its special role in insuring fair and effective law enforcement. A grand jury proceeding is not an adversary hearing in which the guilt or innocence of the accused is adjudicated. Rather, it is an ex parte investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person. The grand jury's investigative power must be broad if its public responsibility is adequately to be discharged."

*See United States v. Calandra*, 414 U.S. 338, 343-344, 94 S.Ct. 613, 617-618, 38 L.Ed.2d 561 (per Powell, J.).

168

As this Court is aware, there is a marked difference between the subpoena power of a federal grand jury and the subpoena power of an Assistant United States Attorney. *See e.g., United States v. R. Enterprises, Inc.*, 498 U.S. 292 (1991). The power of the grand jury is considerable, although it is subject to the power of the District Court, whereas an Assistant United States Attorney is bound by Rule 17, Federal Rules of Criminal Procedure. An Assistant United States Attorney cannot issue a grand jury subpoena for the purpose of conducting his own investigation. *Durbin v. United States*, 221 F.2d 520, 522 (D.C. Cir. 1954);[121] Wright &

---

[121] In *Durbin*, the Court was confronted with a situation where a grand jury subpoena was issued to Andrew Durbin. The subpoena required Durbin to report to an Assistant United States Attorney. When Durbin appeared as directed at the office of the United States Attorney, he was not taken to the grand jury room. Instead, on four days, Durbin was questioned by the Assistant United States Attorney or agents of the FBI, or both. The Court stated:

> The Constitution of the United States, the statutes, the traditions of our law, the deep rooted preferences of our people speak clearly. They recognize the primary and nearly exclusive role of the Grand Jury as the agency of compulsory disclosure. They do not recognize the United States Attorney's office as a proper substitute for the grand jury room and they do not recognize the use of a grand jury subpoena, a process of the District Court, as a compulsory administrative process of the United States Attorney's office. (footnotes omitted)

> It was clearly an improper use of the District Court's process for the Assistant United States Attorney to issue a grand jury subpoena for the purpose of conducting his own inquisition. Nor is such use excusable upon the mistaken notion that a member of the United States Attorney's staff has the duty to be satisfied with what the witness will tell the grand jury before he allows the witness to testify before it, and may therefore use the subpoena as an oppressive tool to achieve such satisfaction.

*Id.* at 522.

169

Miller, Federal Practice & Procedure, Section 104 (CD Rom Version).
Indeed, a grand jury is subject to court's supervision in several
respects and must rely on the power of the district court to compel
production of books, papers, documents and testimony of witnesses.
*United States v. Calandra, supra,* 414 U.S. 338, 346 n.4, 94 S.Ct.
613, 619 n. 4.

Cisneros pretrial Exhibit 28 (i.e., 28a, 28b and 28c) were
grand jury subpoenas issued under the authority of the Brownsville
federal grand jury. According to Mr. Mosbacker's testimony at the
April 27, 1998, pretrial hearing, he issued those subpoenas on his
own authority because there was no grand jury in Brownsville
investigating Cisneros. He also indicated that he believed all of
the subpoenas were returned to the Houston grand jury.

Here, Mr. Mosbacker basically admitted that he was conducting
his own investigation because he stated, in open court as an office
of the Court, that there was no grand jury in Brownsville
investigating Cisneros. Rather, he issued grand jury subpoenas
without the authorization of the foreperson or any member of a
federal grand jury in Brownsville. These "grand jury subpoenas"
were made returnable to a non-investigating Brownsville grand jury.
Although the subpoenas indicated that the materials subject to the
subpoenas were returnable to the Brownsville grand jury, they were
never returned thereto. Rather, Mr. Mosbacker transferred the case
to Houston and had at least some of the subpoenas returned to the
Houston grand jury that ultimately indicted Cisneros. There was no

170

transfer order and no order of disclosure authorizing the materials returnable to the non-existent Brownsville grand jury to the Houston grand jury (unless, of course, the sealed disclosure order introduced during the April 29, 1998, pretrial hearing reflects such authorization, but defense counsel were never supplied with a copy of those disclosure orders). Although Mr. Mosbacker may have been permitted under Rule 6(e)(3)(C)(iii) to disclose matters from one federal grand jury to a second federal grand jury, such is not the case where he personally issued the grand jury subpoenas without authorization from a grand jury and then, ultimately, disclosed the materials obtained thereby to a grand jury which had not authorized and sought the subpoenaed materials.

Additionally, Mr. Mosbacker testified that he met with the Houston grand jury only once, at which time Special Agent Church testified. Therefore, no subpoenas issued from the Houston grand jury.

Defendant Cisneros asserted in her motion to dismiss (and herein) that Mr.Mosbacker's conduct in this matter was an abuse of the grand jury, an abuse of the grand jury's subpoena power, prosecutorial misconduct, forum shopping and violative of Rule 6, F.R.C.P.

In *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), the Supreme Court visited the arena of grand jury violations. *Nova Scotia* involved a wide array of allegations, including a joint appearance by two IRS agents before the grand jury for the purpose of reading transcripts to the

171

jurors. 108 S.Ct. at 2377-2378.    The Supreme Court held that a
district court cannot utilize its supervisory power in derogation
of Rule 52(a) in the context of grand jury violations. As to **non-
constitutional** violations, *Bank of Nova Scotia* held that dismissal
"...is appropriate only 'if it is established that the violation
substantially influenced the grand jury's decision to indict,' or
if there is 'grave doubt' that the decision to indict was free from
the substantial influence of such violations." 108 S.Ct. at 2374
(citing *United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938,
945-946, 89 L.Ed.2d 50 (1986)). These types of violations were
distinguished by the Supreme Court from those types of cases in
which the structural protections of the grand jury have been so
compromised as to render proceedings fundamentally unfair, allowing
the presumption of prejudice because any inquiry into harmless
error would require unguided speculation. 108 S.Ct. at 2374-2375.

In the present case, the structural protections of the grand
jury were so compromised as to render proceedings fundamentally
unfair as well as violative of the Fifth Amendment right to an
indictment,    thereby   mandating   a   presumption   of   prejudice.
Alternatively, Mr. Mosbacker's unauthorized, personal investigation
and his unauthorized, unilateral issuance of subpoenas in the name
of a non-existent grand jury raises a substantial question as to
whether the violations had a substantial effect on the grand jury's
decision to charge. 108 S.Ct. at 2378. Accordingly, the indictment
should have been dismissed and had  this issue been raised on
appeal, it would have resulted in an appellate reversal of the

172

conviction.

### B. SPECIAL AGENT CHURCH'S TESTIMONY BEFORE THE HOUSTON GRAND JURY.

According to Mr. Mosbacker, Special Agent Church -- a one year veteran of the FBI -- was the only witness who appeared before the federal grand jury in Houston that returned the instant indictment on February 23, 1998. Special Agent Church's grand jury testimony is grossly inaccurate (at a minimum) when it is compared to the following pre-existing information (all of which was in the possession of the government prior to the date of the presentment of the indictment): (1) statements by various witnesses given in 1993 and/or 1994 during the state investigation; (2) the trial testimony from the state trial in 1994; (3) exhibits introduced during the state trial in 1994; and (4) FBI 302's obtained from 1994 to April 29, 1998 (the date of the filing of the motion). Since the government knows that it had two federal agents (FBI Agents Barry Ross and Jorge Cisneros) obtaining information regarding this investigation well before Special Agent Church even joined the FBI, it is interesting as to why Mr. Mosbacker choose Special Agent Church to appear and testify before the grand jury. Regardless of the reason for Special Agent Church's appearance before the Houston grand jury, the following is a summary of the significant grossly inaccurate, misleading and perjured information submitted by Special Agent Church (under questioning by Mr. Mosbacker) to the Houston grand jury:

  1. At page 10 of Church's grand jury testimony (a sealed exhibit in the District Clerk's vault), Church stated that

after the initial meeting between Daniel Garza and Maria Martinez, **Garza always understood that the boy (Joey Fischer) was to be killed**. Church's grand jury testimony, summarized above, directly conflicted with the following evidence:

   **a.** Daniel Garza's handwritten signed, written statement of March 31, 1993 (also admitted at his trial as Garza Exhibit A), where the phrase "a 'woman' that needed to have a guy killed" was modified to be "a 'woman' that needed to have a guy 'beaten up'" before Garza signed the statement. This handwritten, signed written statement was reduced to a type written statement and also introduced at the state trial (State Exhibit 44). *See* **Exhibit 6**.

   **b.** Daniel Garza's sworn testimony at the punishment stage of the state trial wherein he testified that he instructed Israel Olivares to "beat up" the boy and that he was surprised when he was told by Israel Olivares that the boy had been killed. *See* **Exhibit 7**.

   **c.** An FBI 302 of an interview of Daniel Garza on June 28, 1996, prepared by Barry Ross and Jorge Cisneros that states, on page 4, the following: "Garza told Martinez the men had killed the subject and she acted surprised and scared." *See* **Exhibit 8**.

As reflected by Church's testimony to the grand jury, none of these conflicting pieces of evidence were brought to the attention of he grand jury. The significance of Church's testimony in this regard is that a false picture/impression

174

was painted for the grand jury.[122]

**2.** At page 18 of Church's grand jury testimony, Church stated that on March 2, 1993 (the day before the murder), Garza came back from Mexico and saw Israel Olivares at the La Quinta Motel in Brownsville. According to Church, this encounter was sometime in **the afternoon or evening and that he (Garza) was not sure of the time he returned to Brownsville**. Church's grand jury testimony, summarized above, directly conflicted with the following evidence:

> **a.** At page 55 of Garza's sworn testimony at the punishment stage of his state trial, Garza testified that this encounter with Olivares occurred in the afternoon of March 2, 1993. Contrary to Church's grand jury testimony, Garza did not say that this encounter occurred in the afternoon or in the evening and that he could not remember the exact time he returned to Brownsville. *See* **Exhibit 7** at page 55.

As reflected by Church's grand jury testimony, this conflict was not brought to the attention of he grand jury. The significance of Church's testimony is that a false picture/impression was painted for the grand jury because Church also testified that Heriberto Pizana checked into the

---

[122] This false picture was reiterated at trial when on direct examination, Garza testified that it was a murder for hire scheme, but on cross-examination admitted that he had never told anyone to kill Fischer, only to beat him up, 11R1438-1439, and that, in fact, Martinez had never told him to have Fischer killed until the end of January 1993 or early February 1993. 11R1362-1363.

La Quinta at approximately 8:30 p.m. and that a vehicle bearing a mexican license plate 821THE7 had crossed the Brownsville International Bridge at approximately 6:39 p.m. Thus, Church smoothed over a serious conflict in the evidence in that, since Garza saw Olivares on the **afternoon** of March 2, 1993, the crossing of the vehicle bearing the mexican license plate 821THE7 at 6:39 p.m., could not constitute the foreign travel contemplated by 18 U.S.C. Section 1958, as alleged in the indictment and the government's bill of particulars. As such, this false picture/impression misled the grand jury on one of the two critical jurisdictional elements (i.e., foreign travel).

**3.** At pages 11-12 and 32 of Church's grand jury testimony, Church testified that Garza **always** called Martinez **collect** from Mexico and that Martinez **always** asked Garza during these calls about the forthcoming murder. It was two of these collect calls that Church insinuated would be contained in the telephone records that he had obtained pursuant to a grand jury subpoena duces tecum that he (Church) had asked for from the Brownsville grand jury. Church's grand jury testimony, summarized above, directly conflicts with the following evidence:

    **a.** Mr. Mosbacker's representations during the pretrial hearing on April 27, 1998, in this case that it was he (Mr.Mosbacker) who had issued the grand jury subpoenas and that there was no grand jury in Brownsville

176

investigating the case.

b. The discovery provided by the government to defense counsel on April 24, 1998, which shows that no collect calls were placed from Mexico to Maria Martinez's house or place of business.[123] Interestingly, Mr. Mosbacker represented to Mr. Canales and Mr. Botsford on March 26, 1998, and again on April 27, 1998, that the government had no foreign records reflecting any telephone calls from Mexico to Maria Martinez, although the government was still looking for such records. Of course, any such records would not reflect collect calls from Mexico to Martinez: such calls would be reflected on Martinez'

---

[123] On November 24, 1997, the government had subpoenaed the subscriber information and toll records for Maria Martinez' store at 713 E. 11th Street (210-546-8137). Records responsive to this subpoena were faxed to the government on December 3, 1997. *See* **Exhibit 5**. The documents responsive to this subpoena, as well as the subpoena Church "returned" to the Houston grand jury by Church on February 23, 1998, reflect the following:

Collect Telephone Calls To Maria Martinez' **Home Telephone Number** (210-544-6319) **for the time frame of 10/97 to 3/3/98** (Which Phone Was Actually Under The Name Of George V. Rosales, 1049 C. Street, Brownsville, Texas), as reflected by documents returned on 2/23/98 by Church to the Houston Grand Jury:

| Date | Place Called From | Nature Of Telephone Called From |
|------|-------------------|----------------------------------|
| 1/27/98 | Brownsville | Local Coin |
| 1/29/98 | Brownsville | Local Coin |
| 2/16/98 | Brownsville | Local Coin |
| 2/16/98 | Brownsville | Local Coin |
| 2/25/98 | Dallas | Private Phone (214-559-7031) |

Collect Telephone Calls To Maria Martinez' **Business Telephone Number** (210-546-8137), **for the time frame of 10/97 to 3/3/98**, which was under the name of Maria Martinez, 713 E. 11th Street, Brownsville, Texas (fax to government on 12/3/97):

| Date | Place Called From | Nature Of Telephone Called From |
|------|-------------------|----------------------------------|
| 11/20/97 | Brownsville | Local Coin |
| 12/21/97 | Martinez, Texas | Private Phone (210-661-4288) |
| 2/20/98 | Worthing MN. | Local Coin |

telephone bills (but there were no such calls).[124]

─────────────

[124] It should be recalled that there was absolutely no physical evidence to substantiate Garza's claim that he had called from Mexico. Indeed as reflected in **CLAIM FOR RELIEF NO. 7**, FBI 302's (memoranda of interviews) reflect the following contact with Garza and his comments regarding telephone calls:

**1.** On June 28, 1996, Garza was interviewed by FBI Agents Barry Ross and Jorge Cisneros. *See* **Exhibit 8**. No calls from Mexico were mentioned.

**2.** On September 30, 1996, FBI Agent Ross received a letter from Garza, dated September 2, 1996. No calls from Mexico were mentioned, although Garza indicated his willingness to assist if certain conditions of cooperation could be met. *See* **Exhibit 9**.

**3.** On November 22, 1996, Garza was interviewed by FBI Agents Barry Ross and Jorge Cisneros. No calls from Mexico were mentioned. *See* **Exhibit 10**.

**4.** On December 9, 1996, Special Agent Ross received a letter from Garza, dated December 3, 1996. No calls from Mexico were mentioned, although Garza indicated his willingness to assist if certain conditions of cooperation could be met. *See* **Exhibit 11**.

**5.** On February 5, 1998, Garza was interviewed by FBI Agents David Church and Freddy Vela. This memorandum of interview reflects the following:

> "Garza advised, before Fischer was murdered, he would call Martinez quite often regarding his martial problems. According to Garza, during every phone conversation, Martinez would ask about the job to kill Fischer. Garza stated Martinez would refer to the job as a "roof job". Garza recalled making several calls to Martinez from public telephones in Matamoros, Mexico, and each time Martinez referred to the "roof job" by asking when Garza would find someone to do the job. Garza also advised he would always call Martinez collect." *See* **Exhibit 12**.

**6.** On February 18, 1998, Garza was interviewed by FBI Agents David Church and Freddy Vela. This memorandum of interview reflects the following:

> " Garza advised he made telephone calls from

**c.** At some time before Church testified before the jury in this case on May 11, 1998, he reviewed Martinez' telephone records and found that there were no collect calls to Martinez from Mexico. 11R1484. Presumably, he would have reviewed the records faxed to the government on December 3, 1997, before he so testified as well as the documents that he had with him that he "returned" to the Houston grand jury on February 23, 1998.[125]

---

Matamoros, Mexico, using public telephones between September and November 1992, to call Maria Martinez. According to Garza, these calls were all collect calls. Garza could not recall where the public telephones he used in Matamoros were located." *See* **Exhibit 13**.

It should also be noted that no FBI 302's of any interview with Garza after the interview of February 18, 1998, were produced to Cisneros' trial counsel after April 29, 1998, presumably because Garza was not interviewed after February 18, 1998, and before he testified during trial. Thus, as of the last known interview with Garza on February 18, 1998, Garza had only mentioned calling Martinez from Matamoros, Mexico.

However, on April 20, 1998, the government's bill of particulars was filed and that bill of particulars included the allegation that Garza had called Martinez not just from Matamoros, **but also from San Fernando, Mexico.** Where, exactly, this information came from is a mystery, as was Garza's trial testimony that he did not call collect, but rather from casetas. A logical, necessary conclusion due to Garza's trial testimony is that after February 18, 1998, Garza was confronted with the fact that the government's examination of Martinez' telephone records reflected a total absence of collect telephone calls from Mexico. Someone associated with the government must have confronted Garza and Garza must have admitted that he had been mistaken (or lied) when he spoke with the FBI on February 5 and 18, 1998. Such an admission should have been turned over to Cisneros defense counsel, but no admission such as this was ever produced by the government. Accordingly, a motion for discovery will be filed in the near future regarding this matter.

[125] Discovery on this matter is also appropriate.

179

**d.** Church's FBI 302 (report of interview) dated January 28, 1998, wherein Church stated that Martinez had told him that she (Martinez) was not aware of any telephone calls that Garza or Cisneros had made that had originated outside the State of Texas or from Mexico.[126] *See also* **Exhibit 4**. *See also* **Exhibit 3** (reflecting that on August 29, 1996, Martinez had failed to relate that any of Garza's calls to her had been from any specific location).

None of these conflicting pieces of evidence were made available to the grand jury. The significance of Church's grand jury testimony, summarized above, is that a false picture/impression was painted for the grand jury as to the second jurisdictional element of 18 U.S.C. Section 1958 (foreign telephone calls), as reflected by the indictment and the government's bill of particulars, because although Garza claimed to have made collect calls from Mexico, the government well knew that there was absolutely no physical evidence to support this claim and that, in fact, there was substantial evidence reflecting that Garza had lied to the FBI on February 5 and 18, 1998, regarding collect calls.

**4.** At pages 25-26 of Church's grand jury testimony, Church

---

[126] The government was also aware from Martinez' state trial testimony that Garza had told her that he had called from Dallas and San Antonio. *See* **CLAIM FOR RELIEF NO. 9, Second Act/Omission** for a detailing listing of Martinez' testimony in this regard (which testimony is also reflected in **Exhibit 2** at pages 1434, 1437 and 1439-1442).

testified that Cisneros had gone into her safety deposit box on the day of the killing, March 3, 1998, and had obtained $3,000 cash to pay to Martinez that same day. Church's grand jury testimony, summarized above, directly conflicted with the following evidence:

a. At the state trial, Karen Wood Stevenson, custodian of records relating to the safety deposit box, testified that the record of entry into the Cisneros' safety deposit box reflected that it was either March 2, 1993 or March 3, 1993, it was not clear which day (although the time was definitely 10:28 a.m. to 10:33 a.m. *See* **Exhibit 15** at page 380)(referencing also State Exhibit 38).

b. Maria Martinez testified at the state trial to the following sequence of events: That at approximately 8:00 a.m. on March 3, 1993, Garza called her and told her that the job had been done and that he was coming over for the money. **Exhibit 2** at page 1442. Martinez told him that the lady had not called her yet. **Exhibit 2** at page 1442. About 15 or 20 minutes later (i.e., 8:15 to 8:20 a.m.), Cisneros called Martinez, at which time Martinez told her that the job was done. **Exhibit 2** at page 1443-1444. Cisneros told her she would be right over. **Exhibit 2** at page 1443-1444. Approximately 7 to 10 minutes later (approximately 8:30 a.m.), Cisneros arrived outside Martinez' store, honked the horn, at which time Martinez went to the vehicle and obtained a thin envelope from

181

Cisneros. **Exhibit 2** at page 1444-1445. Approximately 25 minutes later, Garza arrived and obtained the envelope (i.e. **Exhibit 2** at page 1445). Thus, according to Martinez, the money was delivered by Cisneros to her and by her to Garza by 9:00 a.m. on March 3, 1993, over an hour and one half before the time on the safety deposit box receipt (regardless of whether it was the 2nd or 3rd of March).

**c.** Cristina Cisneros testified at the state trial that on the morning of March 3, 1993, she and her mother left for a doctor's appointment for her (Cristina Cisneros) at 8:15 a.m. *See* **Exhibit 16.** They were at the doctor's office until approximately 10:45 a.m., at which time they went to the store and obtained medicine, and then had lunch at Le Petite. Thereafter, Dora Cisneros took Cristina Cisneros home. **Exhibit 16** at page 157-158. Additionally, Marcos Ray (*see* **Exhibit 17** at pages 1638 *et. seq.*) and Irene Russell (*see* **Exhibit 17** at pages 1647 *et. seq.*), employees of the doctor, confirmed the arrival time and length of stay at the doctor's office, as corroborated by the doctor's sign in records (Cisneros Exhibit C-31).

None of these conflicting pieces of evidence were made available to the grand jury. The significance of Church's grand jury testimony, summarized above, is that a false picture/impression was painted for the grand jury as to the

182

fact that Cisneros allegedly obtained money from her safety deposit box on March 3, 1993, to pay for the hit after learning about the hit that same morning, when that was impossible given the evidence. More importantly, Church was clear and precise: Cisneros went into the box on March 3, 1993, when in truth and in fact, that factual assertion was not only not clear, but directly contradicted by the evidence.

5. At page 6 of Church's grand jury testimony, Church testified that Cisneros and Garza were actually convicted "of the murder and the conspiracy." Church's grand jury testimony, summarized above, directly conflicts with the following evidence:

> a. Cisneros and Garza were convicted only of murder: no conspiracy was submitted to the jury and no conviction was obtained on a conspiracy. See Cisneros' Pretrial Exhibit 22 from the April 27, 1998, pretrial hearing in this case (judgment and sentence).

This conflicting piece of evidence was not made available to the grand jury. The significance of Church's grand jury testimony, summarized above, is that a false picture/impression was painted for the grand jury as to the basis of Cisneros' conviction, which was not only totally inaccurate, but prejudicial.

While the government has no constitutional obligation to produce exculpatory evidence to the grand jury, it does have the obligation to produce accurate, reliable information to the grand

jury (as opposed to present misleading, reckless and/or perjurious testimony). *See e.g.*, *United States v. Basurto*, 497 F.2d. 781 785 (9th Circuit 1974)[127]. *See also United States v. Strouse*, 286 F.3d 767 (5th Cir. 2002)(noting that governmental sponsorship of perjured testimony before grand jury justifies dismissal of indictment).

Additionally, under certain circumstances, relying on hearsay to secure an indictment might qualify as an abuse of the process by itself. In particular, the Fifth Circuit has developed a doctrine concerning the inadmissibility of hearsay in grand jury proceedings. In short, an indictment based on hearsay is invalid if non-hearsay evidence is readily available, if the grand jury was misled into believing it was hearing direct evidence, or if there is a high probability that the grand jury would not have indicted if it had heard the eye witness. *United States v. Cruz*, 478 F.2d 408, 410 (5th Cir.), *cert. denied*, 414 U.S. 910 (1973). *See also*

---

[127] In *Basurto*, *supra*, the Court stated that the following:

> Today, the grand jury relies upon the prosecutor to initiate and prepare criminal cases and investigate which come before it. The prosecutor is present while the grand jury hears testimony; he calls and questions the witnesses and draws the indictment. With that great power and authority there is a correlative duty, and that is not to permit a person to stand trial when he knows that perjury permeates the indictment.

> At the point at which he learned of the perjury before the grand jury, the prosecuting attorney was under a duty to notify the court and the grand jury, to correct the cancer of justice that had become apparent to him. To permit appellants to stand trial when the prosecutor knew of the perjury before the grand jury only allowed the cancer to grow.

184

*United States v. Estepa*, 471 F.2d 1132,, 1136 (2nd Cir. 1972). However, the limitations on "hearsay" have never been considered by the Fifth Circuit as constitutional requirements, but rather as supervisory guidelines. *Id*. at 411. At the same time, it should also be recognized that in the United States Attorney's Manual, the government warns that hearsay should only be submitted to a grand jury on its merits, and that jurors should not be misled as to the quality of the evidence. UNITED STATES ATTORNEY'S MANUAL, § 9-11.232. By establishing a similar policy to that outlined in *Cruz*, the government recognizes the professional obligations of its attorneys in presenting matters to a grand jury in a manner which allows it to make a fair determination. *Id*.

Unfortunately, in this case, there was not a fair presentation to the Houston grand jury. Misleading evidence regarding both jurisdictional bases of the indictment (i.e, foreign travel as well as Garza's alleged calls from Mexico) was presented to the grand jury. In fact, from all of the discovery provided through April 29, 1998, the government could not in good conscience represent to the Court that it had any hard evidence that Cisneros or Palomares caused Pizana to travel in foreign commerce (if he did), or that Cisneros or Palomares caused Garza to call Martinez from Mexico (if he did), let alone that either jurisdictional basis was related to the alleged murder for hire scheme (at a time it was actually a murder for hire scheme, if it was).

The false picture/impression (i.e., perjured testimony) presented before the grand jury was **material** because the vast

185

majority of it related to the two jurisdictional bases which comprised the first element of the offense of murder for hire. *Cf. United States v. Cathey*, 591 F.2d 268, 271-273 (5th Cir. 1979). The false picture/impression (i.e., perjury) "was capable of influencing the tribunal on the issue before it", *United States v. Strouse*, 286 F.3d 767, 771 (5th Cir. 2002). Absent Church's false/picture/impression (i.e., perjured testimony), there was no other evidence before the grand jury on either of the two jurisdictional bases and thus, absent his testimony, there was no evidence upon which to indict Cisneros (as to the first element of the offense).

Clearly, the prosecutor in this case was every bit aware of the evidence that existed as of the date of the grand jury as was FBI Agent Church. *See* **Exhibit 14** [reflecting federal investigation commencing in 1996, obtaining of all information from state prosecutor in 1996, obtaining of all information from state investigatory agency in 1996, and extensive meetings between FBI Agent Church and Mr. Mosbacker on January 7, 1998, and entire week of January 12, 1998 ("...to review all the pertinent information regarding captioned case and form a plan for presenting the case to the Federal Grand Jury on February 17, 1998")].

Under *United States v. Strouse*, *supra*, perjury before the grand jury that was knowingly sponsored by the government can form the basis of a district court's dismissal of an indictment. This government misconduct violates one of the clear rules noted in *Williams*, *supra*. Moreover, by affirmatively allowing perjured

186

testimony to be presented to the grand jury as to the nature of the evidence as to the first element (i.e., jurisdictional bases of Section 1958) and the third element (payment on March 3, 1993), the prosecutor and Agent Church violated Cisneros' right to due process and to a grand jury indictment, in violation of the Fifth Amendment. To conclude that Agent Church's testimony did not substantially influence the grand jury's decision to indict would be utter nonsense, since he was the only witness to appear before it.

Based on the foregoing, it appears probable that had the foregoing issue been raised on appeal, the Fifth Circuit would have reversed the conviction and remanded the case for a dismissal of the indictment or, at the minimum, have remanded for factual findings by the District Court which merely overruled the motion without making any findings of fact. In either event,the failure of appellate counsel to raise this issue on appeal therefore fell below prevailing professional norms and was prejudicial to Cisneros. A new trial should be granted.

**CONCLUSION**

Each of these acts/omissions were unreasonable and prejudicial. Considered individually or collectively, there can be no serious question that the outcome of the appeal probably would have been different; there is unquestionably a reasonable probability that the appellate outcome would have been different. A due process violation occurred because the conviction was affirmed without reviewing the legality of a jury verdict where the

187

jury, over object and requested instructions, was not given any guidance on critical aspects of that element of the offense, to wit: "causation" and the "necessary relationship" between foreign commerce and the alleged murder for hire scheme. A new trial should be granted.

188

VI.

## FORMAL REQUEST FOR AN EVIDENTIARY HEARING
## AND THE ABILITY TO AMEND WITHIN A REASONABLE TIME.

Cisneros intends to file a motion for discovery in the near future. Based on that request Cisneros respectfully requests this Court afford counsel a reasonable amount of time to amend this pleading with the benefit of the results of any discovery that might be authorized by the Court.

Additionally, it appears that an evidentiary hearing will be necessary to fully develop some, but not all, of Cisneros' claims. Accordingly, an evidentiary hearing is respectfully requested.

VII.

### PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, it is respectfully asserted that Cisneros was denied a fair trial, is being held in custody in violation of federal law and the Constitution of the United States, and that her sentence was imposed in violation of federal law and the Constitution of the United States. Accordingly, it is respectfully requested that this Honorable Court

1.    Vacate Cisneros' conviction;

2.    Vacate Cisneros' sentence;

3.    Issue a writ of habeas corpus so that Cisneros may be relieved of her illegal restraint of liberty, such restraint being founded upon an unlawful and unconstitutional conviction and sentence;

4.    Order and conduct an evidentiary hearing;

5.    Allow Cisneros a period of time within which to file

189

such amendments to this Motion as might be necessary to bring all proper matters before this Court after discovery; and

7.   Grant such other and further relief as this Court may deem appropriate.

Respectfully submitted,


DAVID L. BOTSFORD
State Bar No. 02687950
1307 West Avenue
Austin, Texas 78701
512-479-8030: Telephone
512-479-8040: Fax

A.J. "TONY" CANALES
State Bar No. 03737000
P.O. Box 5624
Corpus Christi, Texas 78465-5624
361-883-0601: Telephone
361-884-7023: Fax

## VERIFICATION

"Pursuant to 28 U.S.C. § 2242 and Rule 3(b) of the Habeas Rules of Procedure, I, David L. Botsford, declare under penalty of perjury that the facts asserted in this motion are true and correct, to the best of my knowledge and belief (including, but not limited to, the fact that all acts/omissions of trial and appellate counsel identified in this motion were not the result of strategic decisions, but were oversights and/or induced due to the government's non-disclosure of information, as identified in the motion). Executed on September 29, 2002."

DAVID L. BOTSFORD

191

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the above and foregoing motion to vacate, set aside, and correct judgment & sentence pursuant to 28 U.S.C. § 2255 has been mailed, postage prepaid, via United States Mail, to Mr.  Mervyn Mosbacker, Assistant United States Attorney, 1036 E. Levee, Brownsville, Texas, 78520, on this the 30th day of September 2002.

                                        DAVID L. BOTSFORD

192