S

United States District Court
Southern District of Texas
FILED

JAN 2 1 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | CR. NO. B-98-124 |
| | § | |
| DORA GARCIA CISNEROS | § | |
| Petitioner. | § | |
| (C.A. NO. B-02-191) | § | |

RESPONDENT'S ANSWER TO SECTION 2255 MOTION,
AND MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, hereinafter "the government", files this Answer to Dora Garcia

Cisneros's (Cisneros) Motion for Relief under 28 U.S.C. 2255 and Motion to Dismiss. In support

thereof, the government would respectfully show the court the following:

I.

JURISDICTION

Dora Garcia Cisneros challenges the propriety of the judgment of conviction entered by this

court on August 7, 1998 (DOC 132). Cisneros appealed. The United States Court of Appeals

affirmed in a published opinion issued on October 28, 1999. *United States v. Cisneros*, 194 F.3d 626

(5th Cir. 1999). The court superseded and vacated this opinion on February 3, 2000. *United States*

*v. Cisneros*, 203 F.3d 333 (5th Cir. 2000). The conviction and sentence was again affirmed. The

court granted rehearing en banc, 206 F.3d 448 on February 24, 2000. The en banc court of appeals

again affirmed the judgment of conviction on January 4, 2001, *sub nom. United States v. Marek*, 238

F.3d 310 (5th Cir. 2001). Cisneros filed a petition for a writ of certiorari with the Supreme Court of

the United States. Cert. was denied on October 1, 2001. *Garcia Cisneros v. United States*, 122 S. Ct. 37 (2001).

Cisneros filed the instant motion on September 30, 2002. Cisneros's motion is timely filed and this court is vested with jurisdiction under 28 U.S.C. 2255.

II

STATEMENT OF THE CASE

A.    <u>Course of proceedings</u>

On February 23, 1998, the Grand Jury for the United States District Court for the Southern District of Texas, Brownsville Division, filed the indictment initiating the prosecution of Criminal Case No. B-98-124 (DOC 1). In the indictment it was alleged that Dora Garcia Cisneros and Ramon Palomares "caused another to travel in foreign commerce and caused another to use a facility in foreign commerce, namely telephone communications facilities, with the intent that the murder of Albert Joseph (Joey) Fischer, Jr. be committed in violation of the laws of the State of Texas as consideration for a promise and agreement to pay, and the receipt of $3,000 in United States currency", a violation of 18 U.S.C. § 1958. On March 9, 1998, Cisneros entered a plea of not guilty (DOC 13).

On March 23, 1998, Cisneros filed a motion urging the court to transfer the case from the Brownsville Division of the Southern District of Texas (DOC 26). On March 30, 1998, Cisneros filed, among other motions, a motion to dismiss the indictment for lack of subject matter jurisdiction (DOC 37). This motion was grounded on the proposition that the "murder-for-hire" statute, 18 U.S.C. § 1958, was not meant to preempt state prosecution of similar crimes. Cisneros also filed a motion to dismiss the indictment on the ground that it was barred by double jeopardy (DOC 40).

2

This motion advanced the proposition that Cisneros had been tried in state court, and acquitted by the state's appellate courts[1], on the very facts underlying the federal indictment. Cisneros asserted that the dual sovereignty doctrine did not protect the federal case because it appeared to have been initiated as a result of Cisneros's acquittal in the Texas appellate courts. The government responded to these motions on April 20, 1998 and April 22, 1998 (DOC 52, 60, 69).

On March 30, 1998, Cisneros filed a motion seeking a designation of statements that would be admitted under the theory that they were the statements of co-conspirators, FED. R. EVID. 801(d)(2)(E), together with an order excluding such statements or specific findings supporting their admissibility (DOC 42).

On April 27, 1998, the district court denied the motions to dismiss the indictment and decided to carry the motion respecting the co-conspirators' testimony with the trial (DOC 77).

On April 29, 1998, Cisneros filed a motion to dismiss the indictment on the ground that the evidence presented to the grand jury was misleading and grossly inaccurate (DOC 84). The district judge summarily denied this motion (DOC 84).

On May 4, 1998, a jury was selected and sworn in the Houston Division of the United States District Court for the Southern District of Texas. Thus did the trial of Dora Garcia Cisneros begin (DOC 88). The evidence was closed on May 11, 1998. Cisneros's motion for judgment of acquittal (DOC 107) was denied (*Id.*); her motion to strike a portion of the indictment and her request to submit jury instructions were also denied (*Id.*). On May 12, 1998, the jury returned its verdict: Cisneros was found guilty of a violation of 18 U.S.C. § 1958 (DOC 117).

---

[1]*See State of Texas v. Cisneros*, 915 S.W.2d 217 (Tex.App. -Corpus Christi 1996), p.d.r. ref'd 935 S.W.2d 789 (Tex.Crim.P. 1996).

The district court accepted the jury's verdict, ordered the preparation of a presentence investigation report (PSR), and set the case for sentencing (DOC 118). On May 19, 1998, Cisneros filed a motion for a new trial (DOC 122). In this motion, Cisneros reasserted the grounds set forth in her motion for judgment of acquittal and added the following bases for relief: the court's failure to strike the testimony of Victor Moreno because it had not been linked to Ramon Palomares; the admission of evidence respecting the murder of Joey Fischer in the face of Cisneros's offer to stipulate that a murder had occurred; the government's alleged violations of an agreement not to allude to the fact that anyone had been convicted of a state capital murder offense; the court's failure to submit Cisneros's requested jury instructions numbers 3, 6, 8, 10, 11, 12, 12A, 13, 14, 15, 15A, 17, and 18; and the fact that the judge allegedly blurred the distinction between judge and prosecutor by its questions from the bench as well as from the fact that it reportedly chastised Cisneros's defense attorney in front of the jury. The district court denied Cisneros's motions for judgment notwithstanding the verdict and for a new trial on May 20, 1998 (DOC 124).

On July 27, 1998, the court imposed Cisneros's sentence: she was remanded into the custody of the Bureau of Prisons to serve a term of life imprisonment that was to be followed by a five-year term of supervised release. She was ordered to pay a $25,000 fine and the mandatory assessment of $50 (DOC 130).

Cisneros appealed from the judgment of conviction and sentence. The United States Court of Appeals affirmed the judgment in a published opinion issued on October 28, 1999. *United States v. Cisneros*, 194 F.3d 626 (5th Cir. 1999). On February 3, 2000, this opinion was vacated by the panel and another opinion issued again affirming the judgment of conviction. *United States v. Cisneros*, 203 F.3d 333 (5th Cir. 2000). This opinion was vacated when the court, on its own motion,

4

granted rehearing en banc and consolidated the case with *United States v. Marek*, 198 F.3d 532 (5ᵗʰ Cir. 1999), 206 F.3d 449 (5ᵗʰ Cir. 2000), 206 F.3d 448 (5ᵗʰ Cir. 2000). On January 4, 2001, the en banc court of appeals again affirmed the judgment of conviction without additional elaboration on the issues addressed in the panel opinions. On February 2, 2001, the court denied Cisneros's motion for rehearing. *United States v. Marek*, 238 F.3d 310 (5ᵗʰ Cir. 2001). Cisneros sought relief in the Supreme Court, however, her petition for a writ of certiorari was denied on October 1, 2001. *Garcia Cisneros v. United States*, 122 S.Ct. 37 (2001).

B.      Statement of facts.[2]

       (1)      The tragic death of Albert Joseph "Joey" Fischer, Jr.

To Corinne Nelson, her son, Albert Joseph Fischer Jr., was aptly described as kind, loving, and enthusiastic (6 R. 112). He was a serious student who attended St. Joseph Academy in Brownsville, Texas. His attention to his studies netted him an early acceptance to the University of Texas in Austin (6 R. 113). Yet, one could not say that "Joey" Fischer's scholastic efforts left him aloof. He regularly socialized with a small group of friends and, in the latter part of his junior year, he dated Cristina Cisneros (6 R. 113, 114, 136; 8 R. 626, 675, 709).

The springtime relationship with Cristina Cisneros ended before spring became summer, however. Corinne Nelson recalled that Joey and Cristina had exchanged their class rings. When Joey deemed it time to move on socially, he returned Cristina's; Cristina did not return his (6 R. 116; 8 R. 628, 675; 10 R. 1341). Corinne and her husband, Joey's stepfather, Bo Nelson, suggested that he write Cristina a letter explaining why she should return his ring (6 R. 117, 138-139). Sometime

---

[2]Record citations refer to the volumes and pages of the records on appeal.

later, and after several meetings and implorations, Cristina returned the ring (6 R. 118, 139, 140; 8 R. 638, 704, 716).

Joey's sister, Kathryn Fischer, recalled that Dora Garcia Cisneros called Joey after he broke up with Cristina. After he had talked to Dora Cisneros, Kathryn was left with the impression that her brother was upset (8 R. 681).

Dora Cisneros called Joey's father, Albert "Buddy" Fischer, after the breakup as well (8 R. 703, 711). Dora wanted to know why Joey was no longer seeing her daughter (8 R. 713). Later, after Cristina called to set up a meeting with Buddy Fischer to discuss Joey's ring, Dora attended and reportedly did most of the talking. Dora wanted to know if there was anything Buddy could do to encourage Joey to see Cristina again (8 R. 714).

In late November or early December of 1992, Corinne Nelson opened her mailbox and retrieved two envelopes. Inside the envelopes were copies of a card and a white piece of paper bearing a big red letter "A". The card bore a picture of a skull and bones. Corinne Nelson was at a loss: she had no idea who would send her such a thing (6 R. 123).

By the spring of 1993, the Nelson/Fischer household had established a morning routine: Joey drove his brother Eric to school after having dropped his mother off at the school where she taught (6 R. 124, 157). On March 3, 1993, Corinne decided to ride to work with her husband, Bo Nelson. She gave Joey his lunch money, kissed him good by, and told him what she planned on doing. She urged Eric to hurry or they would be late. Corinne then returned to her bedroom to finish getting dressed. At this point she related that she heard two loud noises - which could have been either a car backfiring or gun shots. Corinne and her husband rushed into the kitchen. Bo went to Eric's

room while Corinne went into the garage. When she saw that the car was gone, she assumed that Joey and Eric had left for school (6 R. 125-126, 140; 8 R. 678; 11 R. 1465).

Corinne Nelson went back into the house, uncertain as to the source of the noises they had just heard. In the house, she ran into Eric and wondered what had happened to Joey. Glancing out the window she saw water streaming down the driveway. She returned to the garage and raised the door that had not been opened. Joey was lying on the floor of the garage in a pool of blood, a water hose running in his hand. Corinne Nelson screamed (6 R. 126, 127, 141-143, 149; 8 R. 678; 11 R. 1470).

On the ground next to her son, Corinne Nelson saw a card. She picked the card up wondering what it was; her husband told her to put it down (6 R. 127, 128). Bo Nelson recalled that the yellow card Corinne had picked up that morning was a bail bondsman's card inscribed with a Dallas or Fort Worth area code (6 R. 150).

The police and sheriff's investigators asked Bo and Corinne Nelson why they thought anyone would want to kill Joey. Bo recalled that he worked for a firm, the Hung Shrimp Farm of Arroyo, Texas, that was a party to a lawsuit involving several million dollars (6 R. 154).

Herculano Jiminez testified that he was on his way to work in Rancho Viejo at about 7:00 a.m., on the morning of March 3, 1993, when he was passed by a four-door automobile bearing Mexican license plates (6 R. 170). Jiminez recalled that the car was occupied by one individual - the driver (6 R. 171, 179). In fact, Eric Fischer recalled that, shortly after hearing the two gunshots, he also saw a white car driving south on the frontage road (11 R. 1466, 1469). Herculano Jiminez was interviewed the day after the murder, Thursday, March 4, 1993, by Cameron County Deputy Sheriff Abel Perez, Jr. (7 R. 225).

7

At about 7:30 a.m., on the morning of March 3, 1993, Cameron County Deputy Sheriff Abel Perez, Jr. received a call from the dispatcher directing him to 3 Cortez, Rancho Viejo (7 R. 211). Upon arriving at the designated address, Deputy Perez noted the presence of other police officers and a body lying in the driveway in a pool of blood (7 R. 212). By the end of the day, the Cameron County Sheriff's Office had assumed control of the investigation; Deputy Perez had been assigned to lead it (7 R. 219).

(2)    The investigation into the death of Joey Fischer.

After interviewing the deceased's family and friends, Abel Perez called the number inscribed on the card found in the driveway by Corinne Nelson. The number was that of the Collin County Bond Company in McKinney, Texas (7 R. 220). In addition to the card, the investigating officers found a tennis shoe print on the air conditioner unit located just outside of the residence. The officers did not find any other evidence that day nor did they have any other leads as to why someone wanted to kill Joey Fischer, Jr. (7 R. 222).

On Friday, March 5, 1993, the proprietor of the Collin County Bond Company facsimiled a bond application for one Rudy Cuellar to the Cameron County Sheriff's Office. Perez had asked the bond company's owner to send him any applications he might have had originating from a resident of the Rio Grande Valley/Brownsville/Matamoros area (7 R. 227-28, 399, 400). Upon receiving Cuellar's application, Deputy Perez noted the similarity in the numbers "2" and "4" inscribed on the card and the numbers inscribed on the application (7 R. 231). As of March 5, 1993, the only viable theory the deputy had respecting a motive for Joey Fischer's demise was the lawsuit that involved Bo Nelson's shrimp farm company (7 R. 234). Thus, the decision was made to travel to McKinney to locate Rudy Cuellar (7 R. 235).

A cursory records check at the Collin County Sheriff's Office revealed that Cuellar had bonded out of jail on February 25, 1993. Cuellar was facing charges for assault (7 R. 237). Deputy Perez made arrangements to interview Cuellar in the bond company office on March 8, 1993 (7 R. 237, 238).

On March 8, 1993, Perez, a Collin County Deputy, and the owner of the bond company waited for Cuellar in the bond company's office. Another investigator assumed a position across the street in the sheriff's office parking lot to see what kind of vehicle Cuellar would be driving to this meeting. When Cuellar entered the office, Deputy Perez introduced himself and initiated a cursory pat-down of Cuellar and the individual who had accompanied him. Cuellar's cohort was carrying a pocket full of .45 caliber bullets, seven of them (7 R. 238).

A few minutes into the interview, Deputy Perez decided to go outside to see what kind of car Cuellar had used to convey himself to the office. Upon walking out the door, the Cameron County deputy saw the other Collin County investigator struggling with a third individual just outside Cuellar's vehicle. This individual was resisting the officer's attempt to handcuff him. Deputy Perez quickly assisted his fellow officer in subduing and handcuffing Cuellar's cohort. Inside the car, the officers found some cocaine and a handgun, a nine millimeter (7 R. 239). On the rear floorboard, they also found a .38 Super round - the type of ammunition that had been fired into Joey Fischer (7 R. 240). On March 8, 1993, Deputy Perez and Cameron County District Attorney's Office Investigator George Gavito returned to Brownsville with the .38 Super bullet, Cueller's tennis shoes and photographs of Rudy Cuellar and his traveling companions (7 R. 244).

In addition to the shoes, the bullet, and the photographs, the deputy returned to Brownsville with a new theory for the murder: a mystery woman had hired the gunmen to avenge the honor of

9

a young lady who had reportedly been sexually molested (7 R. 245).  To develop this theory, Deputy

Perez had to talk to Ramiro Moya and Israel Olivarez, commonly known as "El Chuntaro" (7 R. 245,

252).  Israel Olivarez resided in Matamoros but frequently came to Brownsville to see his uncle,

Marcelino Olivarez (7 R. 249).

　　In addition to "El Chuntaro", Deputy Perez learned that Olivarez also identified himself as

"Rafael Mata Soto" (7 R. 252).    Most of what Perez learned about Olivarez came from the

Brownsville Police Department's Auto Theft Division - Olivarez's crime of choice was auto theft:

he reportedly took stolen cars to Dallas and Chicago (7 R. 253).  Records of the Cameron County

Sheriff's office revealed that Olivarez was named in several outstanding capiases.  In addition to

Olivarez, the Cameron County courts were looking for another individual who had apparently

participated in that particular theft; his name was Heriberto Pizana (7 R. 253, 254).

　　Even as he pursued information on Olivarez, Pizana, and a fellow from San Antonio called

Ramiro Moya, Deputy Perez requested telephone records from the Brownsville La Quinta Inn as well

as bank records for the account of Dora Cisneros (7 R. 257, 258).  Perez's investigation now focused

on two Brownsville women: Dora Cisneros of 1545 Oriole Lane and Maria Martinez of 1049 C

Street - the street behind the La Quinta (7 R. 258).

　　The physical hub of the investigation was the La Quinta Inn.  The La Quinta was within

walking distance of the B&M Bridge into Mexico, of Maria Martinez's residence and second hand

clothing business, as well as Israel Olivarez's uncle's house (7 R. 264, 265; 10 R. 1215).  On

February 3, 1993, at 3:38 a.m., Rodolfo Cuellar and Ramiro Moya checked into the La Quinta Inn

and remained there until February 7, 1993 (10 R. 1218).  Moya signed into the hotel on February 5,

10

1993 and left on February 6, 1993. Cuellar and Moya occuped adjoining rooms, Rooms 250 and 248 (10 R. 1219).

Daniel Garza checked into the La Quinta on February 16, 1993 and remained there until the seventeenth (10 R. 1219). Garza returned to the hotel on March 1, 1993, and remained there until March 12, 1993. Hotel records reflected that telephone calls were made from Garza's room to 214-526-3314. This telephone number happened to be the same one written on Cuellar's application for a bail bond (10 R. 1220; 11 R. 1421-22). Garza explained that he actually checked into the room on February 26, 1993, and then allowed another individual who was in the country illegally to use his name to register on March 1, 1993. Garza testified that the young man remained in Brownsville until March 12, 1993, but he flew back to San Antonio on March 4, 1993 (11 R. 1422, 1428).

On March 2, 1993, Heriberto Pizana and Ramon Palomares occupied Room 147 of the La Quinta Inn. Pizana and Palomares left on March 4, 1993 without retrieving their cash deposit (10 R. 1221, 1229, 1243). Records reflect one call was made from this room to 214-526-3314 on March 3, 1993, at 10:19 a.m. (10 R. 1222). Pizana's and Palomares's registration included a license number: 821TWEX.[3] This license plate was for a white, Fronteriza Grand Prix out of Tamaulipas, Mexico (10 R. 1222-23, 1224). Hotel records reflected that Pizana and Palomares had taken rooms in the Brownsville La Quinta shortly before their March 1993 stay - Pizana had registered for a room in November of 1992 as well (10 R. 1231-32). On both occasions they gave the registrar Brownsville or Texas addresses (10 R. 1231).

Records of the Treasury Enforcement Communications System revealed that a vehicle bearing license plate 821THE7 crossed the B&M International Bridge into the United States on

_____

[3]On further examination, the license number proved to be 821THE7 (10 R. 1224).

11

March 2, 1993 (10 R. 1249-1252). This record indicated that the vehicle traveled from Matamoros, Mexico into the Brownsville Port of Entry into the United States (10 R. 1253).

A two- to three hour interview with Ramiro Moya led Deputy Perez and Investigator Ernesto Flores to San Antonio on March 30, 1993 (7 R. 271, 272). The investigators went to San Antonio to interview Moya's half-brother, Daniel Garza (7 R. 272; 9 R. 998). The investigators interviewed Daniel Garza in their Days Inn hotel room for about an hour on March 31, 1993. At the end of that interview, Garza agreed to accompany the officers back to Brownsville (7 R. 275).

Daniel Garza returned to Brownsville with Ernesto Flores and Abel Perez, Jr. While Flores drove, Perez joined Garza in the back seat and began to take his statement (7 R. 277). Sometime during this back-seat conversation, Deputy Perez advised Garza of his constitutional rights (7 R. 278). Perez recalled that it took between two and three hours to get Garza's statement. The statement was finished by the time they reached Brownsville. Deputy Perez related that Garza read the statement and signed it (7 R. 278). Even after he had completed and signed his statement, Daniel Garza's cooperation continued: He agreed to wear a wire when he contacted another person whom the officers had reason to believe was involved in the offense. The person Daniel Garza was to contact was Maria Martinez, a *curandera*, that is, a folk healer or fortune teller (7 R. 281).

On April 1, 1993, Daniel Garza reported to the Cameron County Sheriff's office. A small transmitter was affixed to a cap that was given to Garza to wear. Abel Perez instructed Garza to contact Maria Martinez. Once he had contacted her, Garza was to tell her that the gunmen he had hired wanted more money from her "client" (7 R. 285-286). The equipment used in this effort was provided by Drug Enforcement Administration Special Agent Larry Councilman (7 R. 286; 9 R. 933).

Once the wire was prepared, Garza was taken to a location about two blocks from Maria Martinez's business at 713 East 11th Street in Brownsville. Deputy Perez and his fellow officers established surveillance across the street in a parking lot (7 R. 287). Perez, his boss – the Sheriff of Cameron County – Alex Perez, Agent Councilman, and Ernesto Flores occupied an unmarked Bronco; their presence was concealed by tinted windows (7 R. 288; 9 R. 938, 983).

Garza was in the *curandera*'s shop for around forty-five minutes (7 R. 289). He returned to Maria Martinez's shop later that day at around 7:30 p.m., April 1, 1993 (7 R. 292, 293). Just as he did on his first visit, Daniel Garza wore the cap with the transmitter affixed to it (7 R. 293; 9 R. 936). This visit with the *curandera* also lasted about forty-five minutes. This time when Garza left the shop he was carrying 100,000 Mexican pesos (7 R. 294).

On April 5, 1993, Daniel Garza called upon Maria Martinez one more time. This visit was monitored just as the two made on April first were: Garza wore a transmitter in his cap and his visit was observed by Deputy Perez and his associates. On April 5, 1993, Daniel Garza left the *curandera*'s business with $100 (7 R. 296- 297).

While Deputy Perez and Investigator Flores monitored the activities of Daniel Garza on April 1 and 5, 1993, Deputies Luis Gutierrez and Willie Alvarez watched the comings and goings of Dora Cisneros at her residence (7 R. 299; 10 R. 1272). Luis Gutierrez reported that at about 1:30 p.m., on April 5, 1993, Dora Cisneros emerged from her husband's office and set out for Boca Chica Boulevard at a "fairly high rate of speed" (10 R. 1272-1273). Gutierrez and Alvarez were not able to follow her and decided to return to the office. The decision to return to office proved to be well taken: within an hour after leaving, Dora Cisneros returned (10 R. 1274). At about 3 o'clock p.m.,

13

Gutierrez and Alvarez watched as Cisneros came out of the office and followed her to the Texas Commerce Bank on Boca Chica Boulevard (*Id.*).

From the Texas Commerce Bank, Cisneros drove over to a shopping center where she used a public telephone. Luis Gutierrez recalled that she used the telephone for about three minutes. It was 3:30 p.m. (10 R. 1277).

After using the telephone, Cisneros returned to her home. She remained at the house until about 6:15 p.m. She drove over to the Palo Verde Subdivision where she remained until roughly 7:01 p.m. (10 R. 1278). She emerged from the subdivision and returned home (10 R. 1279).

On April 6, 1993, Gutierrez followed Cisneros from her house to a shopping center where she used a public telephone. Gutierrez related that this shopping center was located only a few blocks from the Cisneros residence (10 R. 1279). It was shortly after 7 a.m. (10 R. 1280). After Cisneros completed her telephone call, Gutierrez received instructions to terminate his surveillance (10 R. 1280).

On April 5, 1993, Deputy Perez and his associates applied for and received a warrant authorizing the search of Maria Martinez's residence and place of business (7 R. 302; 9 R. 998). The warrant authorizing the search of the residence was executed first. From the residence, the officers found and seized telephone records and a couple of tarot cards (7 R. 303). From the residence, the officers proceeded to the business. Martinez, who had been placed under arrest at her house, accompanied them to her shop (7 R. 303). From the business, the officers seized some photographs, a part of what appeared to be a human skull, some documents, and some fortune telling cards (7 R. 305).

14

Maria Martinez was taken to the Cameron County Sheriff's Office where she was interviewed. By the end of the interview, Maria Martinez had confessed her role in the murder of Joey Fischer (7 R. 308).

On April 6, 1993, Maria Martinez was wired and arrangements were made to monitor Martinez in a meeting with Dora Cisneros (7 R. 310, 311). That morning Dora Cisneros picked Maria Martinez up in front of the pharmacy located on Jefferson Street. Cisneros was driving a brown, four-door Cadillac. Maria Martinez joined Cisneros in the front seat (7 R. 322, 323). Cisneros had driven some two or three blocks when she was stopped. Cisneros and Martinez were taken from the site of the stop back to the Sheriff's Office (7 R. 328).

When the vehicle was stopped, Maria Martinez was holding a white envelope containing five $100 bills (7 R. 372; 9 R. 1010-11). Dora Cisneros quickly declared that the money represented an amount she owed Martinez (7 R. 377; 9 R. 1010).

Victor Moreno testified that he went to work for Rudy Cuellar in 1992 (8 R. 560). Moreno and Cuellar had been childhood acquaintances in Ciudad Mante, Tamaulipas, Mexico. When the college educated Moreno experienced difficulty in securing employment, his friends put him in touch with Rudy Cuellar. Cuellar owned several apartment properties in East Dallas as well as a night club, the "El Jacara". Moreno related that Cuellar employed him to deliver narcotics to Dallas-area stash houses and to take steps to collect from those who failed to pay for their delivery (8 R. 560, 561, 592, 594). In connection with his drug business, Cuellar reportedly retained several individuals whom Moreno described as "hitmen": Mario Carmona, Ramon Palomares, and a fellow he knew only as "Israel" (8 R. 561, 562).

15

Moreno related that he accompanied Daniel Garza and Santiago Herrera to Oakley, a suburb of Dallas, Texas, where they purchased a pistol, a .38 Super (8 R. 564, 565, 566). This weapon was purchased on orders from Rodolfo Cuellar (8 R. 563, 565, 611; 11 R. 1392). After the weapon was purchased, Daniel Garza turned it over to Moreno (8 R. 599; 11 R. 1394). The .38 Super was purchased on February 1, 1993 (7 R. 393-94; 8 R. 602; 11 R. 1390).

Victor Moreno recalled that the advancement of Rudy Cuellar's narcotics trafficking business occasionally required that someone be killed (8 R. 570). Thus, sometime in 1993, Moreno was party to a discussion involving Ramon Palomares and Rudy Cuellar (8 R. 572). According to Moreno, Palomares was telling Rudy Cuellar about something he had done in Brownsville. Earlier Cuellar had become highly agitated with Palomares because Palomares had called him on the telephone to tell him that he had killed someone in Brownsville (8 R. 576). This murder reportedly involved Palomares, "Heriberto" or "Eddie", and "Israel" (8 R. 582).

Moreno recalled that the Brownsville murder involved a boy who had a relationship with a girl (8 R. 613). Moreno did not know who wanted the boy killed (8 R. 615).

In May 1992, Daniel Garza separated from his wife. To correct this situation, Garza consulted Maria Martinez in Brownsville, Texas (11 R. 1356, 1358).

In October of 1992, Martinez told Garza that one of her clients was looking for someone to "beat up" a boy who had reportedly taken some things from her daughter (11 R. 1359, 1360). Garza related that he understood that the boy had taken a ring from the girl. Martinez told him that her client was offering $3,000 for someone to beat the lad up (11 R. 1361, 1438, 1439). Garza recalled that he had been led to believe that the boy had been sexually intimate with the girl in a condominium on Padre Island (11 R. 1361). Maria Martinez told Garza that the boy attended St.

16

Joseph's Academy (11 R. 1362). In either late January or early February of 1993, Maria Martinez told Garza that her client's desire had changed: she now wanted the boy killed (11 R. 1363).

Garza related that he was consulting with Martinez once or twice a month and recalled staying in the La Quinta Inn during the time she was talking to him about killing the boy (11 R. 1363, 1364). When he was not in Brownsville, Garza called Martinez. He testified that he called her from San Antonio, Brownsville, and San Fernando, Tamaulipas, Mexico (11 R. 1364, 1482). Martinez and Garza employed a code when they talked about the boy: Martinez might ask if he had "knock[ed] down the roof of the house" (11 R. 1366). Garza recalled about four telephone calls from Mexico - two from San Fernando and two from Matamoros (11 R. 1366). Martinez and Garza spent half of their time talking about Garza's marital problems and half of the time talking about "knocking down the roof of the house" (11 R. 1367, 1448).

Garza related that he kept putting Martinez off by telling her that he had found some men to do the job on "the roof" when, in fact, he had not. This changed, however, when he heard about three men in Brownsville (11 R. 1368). Garza related that these men stayed at a house about two blocks from the La Quinta Inn (11 R. 1368). Garza recalled that one of these men was called "Israel" and another was called "Eddie Pizana" (11 R. 1369).

Garza met these fellows in Dallas, Texas, around February 14, 1993 (11 R. 1370, 1432-33). Garza recalled that he met Israel in a club, the "Fiesta Palace". Garza told Israel that there was a woman in Brownsville who was offering $3,000 to have a boy either beaten up or killed (11 R. 1371). Since neither Martinez nor her client wanted to know the men who would do the job, Garza identified the subject by giving Israel and "Eddie" a photograph of the boy together with a yellow piece of paper with two addresses written on it. The picture had been given to Garza by Maria

17

Martinez in late 1992 (11 R. 1373, 1374). According to Garza, the picture depicted a boy wearing a tuxedo and bow tie (11 R. 1374-75).

Garza recalled that the next conversation he had with Israel occurred after the murder of Joey Fischer. He related that he was on his way back to San Antonio from San Fernando on March 2, 1993 (11 R. 1377). Garza saw Israel at the La Quinta. He talked to him outside of Israel's room on the second floor; Israel told him he was ready to do the job for the lady (11 R. 1379).

Israel called Garza the next morning, March 3, 1993, sometime between 7 and 8 o'clock (11 R. 1381). Garza called Martinez and told her that "the deer had fallen" and "the men wanted their money" (11 R. 1382). Martinez told him to come to the store. When Garza arrived, Martinez told him that she needed proof that the job was done before she could get any money (11 R. 1382-1383, 1449). Garza relayed this information to Israel who became somewhat annoyed. Israel reportedly told Garza that he thought the woman was lying and declared that he should go and kill her as well. Garza told him to hold on; she had told him to come back between 10:30 and 11:00 (11 R. 1383). While he was talking to Israel, Garza saw Heriberto "Eddie" Pizana walking around in the room (11 R. 1384).

Garza recalled that while he was waiting he saw the reports of Joey Fischer's murder on the morning news (11 R. 1384). Shortly thereafter Heriberto Pizana came to his room. Pizana gave Garza a ride back to Martinez's shop to pick up the money. Pizana parked the car in an alley and Garza got out and went into Martinez's shop. Martinez told Garza that her "client" had brought the money (11 R. 1385). Martinez gave him an envelope containing the amount that had been promised for the murder (11 R. 1387, 1444-45).

(3)     The testimony of the *curandera*.

18

Maria Mercedes Martinez was 72 years old in 1993. Martinez was born in Mexico but had lived in Brownsville for as long as she could remember (8 R. 720). She confessed that she had entered a plea of guilty to the murder of Joey Fischer and had received a twenty-year sentence (8 R. 721). Prior to her incarceration, Martinez owned a little store in which she sold clothes - used and new - and read cards (8 R. 723). Martinez explained that people would come to her to have their cards read to see whether they would get a job or be in good health or to find something they might have lost. She learned to read the cards in her youth; she was taught by an aunt. In addition to reading cards and selling clothes, Maria Martinez gave her clients massages and other folk cures (8 R. 724). She declared that people referred to her as a *curandera*, a folk healer (8 R. 725).

Maria Martinez's business was located across the street from the office occupied by Dora Cisneros's husband. In the beginning, Cisneros and Martinez enjoyed a passing acquaintance: they would greet one another when they passed on the street. Eventually, Cisneros brought Martinez used clothes for resale (8 R. 726). Twice a week, Martinez read cards for Dora Cisneros (8 R. 727).

Initially, Martinez read the cards to find out why Cisneros was feeling ill. For this service, Cisneros paid Martinez $5 (8 R. 727). At one point, sometime in September 1992 (8 R. 732-33), Dora Cisneros asked Maria Martinez to read the cards to see if her daughter's boyfriend was going to marry her (8 R. 728). The cards told Martinez that the boyfriend did not want to marry Dora Cisneros's daughter "anymore". When Martinez conveyed the cards' message to Dora Cisneros, her client became very upset (8 R. 729).

Three days later, in early October 1992 (8 R. 733), Dora Cisneros returned to Martinez's shop. Martinez related that she was loathe to perform the task that Cisneros wanted her to perform,

to wit, to cast a spell on the young man who was no longer wooing her daughter. According to Martinez, Cisneros wanted the lad to die (8 R. 730).

Dora Cisneros returned to Martnez's shop on October 31, 1992 (8 R. 733). During this visit Cisneros told Martinez that she was looking for some men to do a "little job" for her. Martinez thought she was referring to yard work; Cisneros did not elaborate (8 R. 733). Eventually, Cisneros explained what she wanted done; Martinez told her that she had referred the matter to a man by the name of Daniel Garza (8 R. 734). According to Martinez, the matter that Dora Cisneros referred to Daniel Garza was the murder of her daughter's boyfriend (8 R. 735).

Martinez recalled that after the matter had been referred to Garza, Dora Cisneros gave her an envelope containing a photograph of someone wearing a bow tie (8 R. 736). Martinez related that Garza had originally consulted her for assistance in dealing with his estranged wife. Martinez testified that she gave him some bottles of oil that he could apply to resolve his familial difficulties (8 R. 737).

After Maria Martinez gave the envelope to Daniel Garza, Dora Cisneros called daily to find out what was going on (8 R. 738). Later, Daniel Garza called Maria Martinez and told her to tell the lady who had paid him that the job was done. Martinez recalled that she received this call around 8:00 a.m one morning (8 R. 739).

Not one hour later, Dora Cisneros called Martinez. Martinez recalled that it was about 9:00 a.m. She told Cisneros that the man had called and wanted her to bring the money. Cisneros delivered an envelope to Martinez at Martinez's shop. Shortly thereafter, Garza arrived and Martinez handed the envelope over to him (8 R. 740; 9 R. 912).

Maria Martinez testified that she never told Daniel Garza who wanted Joey Fischer killed; she referred to Cisneros as "the client" (9 R. 864-865). After Joey Fischer's death, Maria Martinez reported that Dora Cisneros called her almost every day. Cisneros asked Martinez, whom she called "Tia", if she had heard anything, she replied that she did not know anything (9 R. 867). Shortly after the murder, Daniel Garza told Martinez that the "Bad One" was asking for more money (9 R. 868). When Dora Cisneros called, Martinez told her that Daniel Garza needed more money. It was at about this time that Maria Martinez was arrested (9 R. 869).

Martinez agreed to cooperate in the investigation. She told the officers that Dora Cisneros was supposed to meet with her the next day. Martinez had no qualms about wearing a wire to this meeting. Thus, at six o'clock the next morning, Maria Martinez was prepared for her meeting with Dora Cisneros (9 R. 873, 874). After the wire was prepared, Martinez and District Attorney Investigator Flores went to her office. They entered the office at seven o'clock; the telephone was ringing (9 R. 874, 1000-01).

It was Dora Cisneros. She wanted Martinez to come over to the pharmacy across the street for her money; she was afraid to go to Martinez's office (9 R. 875, 1005, 1029). Flores told Martinez to go and meet her. Maria Martinez hung up the telephone and crossed the street to where Dora Cisneros was waiting in her car. Cisneros told her to get in but Martinez hesitated. When Cisneros asked her what was wrong, Martinez got in (9 R. 876). Cisneros told Martinez that she was short some $200 and asked if Maria Martinez could make up the shortfall. As Martinez entered the car, Dora Cisneros gave her an envelope that reportedly contained five hundred dollars (9 R. 877, 878). Maria Martinez asked Cisneros to drop her off where she had picked her up; Cisneros told her

21

that would be fine because she was on her way to the H.E.B. grocery store (9 R. 921). At this point the officers stopped them (9 R. 878).

The government rested its case against Dora Cisneros with the testimony of Eric Fischer on May 11, 1998 (11 R. 1473). After the district court denied her motion for a judgment of acquittal (11 R. 1478), Cisneros offered the testimony of Federal Bureau of Investigation Special Agent David Church (11 R. 1481-1484) to show that Daniel Garza did not make any collect telephone calls from Mexico. In addition, Cisneros called the owner of a restaurant, Nancy De Leon, to show where and when she and her daughter ate lunch on March 3, 1993 (11 R. 1487-1490). With testimony of Nancy De Leon, the evidence was closed (11 R. 1492).

After the district court again denied Cisneros's motion for a judgment of acquittal (11 R. 1494), the jury was charged (11 R. 1502-1520), the parties argued (12 R. 1527-1590), and the jury retired to deliberate (12 R. 1593-1609). After due deliberation, the jury returned its verdict: Dora Cisneros was found guilty of the charge set forth in the indictment (12 R. 1609).

C.    The opinions of the court of appeals

   1.    194 F.3d 626

In the first opinion issued by the court of appeals in Cisneros' direct appeal, *United States v. Cisneros*, 194 F.3d 626 (5th Cir. 1999), the court initially broached the issue of whether there was sufficient evidence to show that Cisneros met the interstate/foreign commerce requirement to sustain a conviction under the federal murder for hire statute, 18 U.S.C. § 1956. 194 F.3d at 631. The panel observed that legislative history supported the proposition that the court should use the substantive part of 18 U.S.C. § 1956, that is § 1956 (a), which provides that jurisdiction vests in the federal court for anyone who "uses or causes another to use the mail or any facility in interstate or foreign

22

commerce, with intent that a murder be committed . . . ", in assessing whether or not the government satisfied its burden of proof on the jurisdictional element of the offense. 194 F.3d at 631, 635. Prior to holding that the government satisfied its burden, the court observed that the government did not have to show that "Cisneros intended to cause interstate/foreign commerce or even that she knew it occurred." 194 F.3d at 636. The court then held that the testimony that Daniel Garza made telephone calls from Mexico during which the murder of Joey Fisher was discussed supported the finding that Cisneros caused another to use any facility in foreign commerce. 194 F.3d at 636. The court rejected Cisneros' contention that the evidence had to establish that she caused the "telephone to be used in furtherance of the murder-for-hire", 194 F.3d at 636, and eschewed discussion of the government's alternate theory of jurisdiction, to wit, the car travel between Mexico and Texas. 194 F.3d at 637.

Next, the court addressed the district court's denial of a new trial grounded on the government's improvident eliciting of testimony touching upon Cisneros' state prosecution. The appellate court held that (a) Cisneros was not prejudiced by the government's violation of the court's pre-trial order and (b) the government properly asked Garza if he had been convicted of capital murder. 194 F.3d at 637.

Thereafter the court addressed Cisneros' contentions that the district judge had erred by refusing to submit her requested instructions to the jury. The court found that the jury correctly instructed the jury on the jurisdictional element of the offense, the district court correctly refused an instruction that constituted a "judicially narrated account" of the defense's facts, the failure to properly object to the admission of tape-recorded conversations precluded a finding of plain error with respect to a requested limiting instruction, the district court correctly refused Cisneros'

23

instruction on causation, and the district court correctly refused Cisneros' instruction on limitations. 194 F.3d at 638-39.

In succession, the panel also found that the district court did not err when it admitted the photographs of Joey Fischer's murdered corpse, 194 F.3d at 639, and did not fail to maintain an appearance of impartiality in its questioning of witnesses, *Id*. The court concluded by holding that the district court did not err when it admitted testimony of a co-conspirator, 194 F.3d at 640-41.

2.    203 F.3d 331

On February 3, 2000, the panel vacated the opinion issued on October 28, 1999, replaced the opinion, but in all other respects denied Cisneros' petition for panel rehearing. *United States v. Cisneros*, 203 F.3d 331 (5th Cir. 2000). In its second opinion, the panel did not modify its summary of the facts. 203 F.3d at 336-339. Close examination of the court's analysis of the jurisdictional element of the offense fails to disclose any significant change. 203 F.3d at 339-343. The first discernable change in the court's opinion is found in its discussion of Cisneros' assertion that Garza's international telephone calls were not "in furtherance of the murder for hire":

> Second, Cisneros contends that the evidence did not establish that the international calls were "in furtherance of" the murder-for-hire. In other words Cisneros argues that there was not a sufficient nexus between the foreign telephone calls and the murder scheme to violate the federal murder-for-hire statute. [FN 6] She draws the support for her argument from the First Circuit's decision in *United States v. Houlihan*, 92 F.3d 1271, 1292 (1st Cir. 1996), where the First Circuit panel required the use of the interstate facility in interstate commerce to be "in furtherance" of the underlying murder scheme. That is not the standard our circuit uses, however. In cases examining the nexus requirement in the context of the Travel Act, we merely require that the use of the facility in interstate or foreign commerce - - here, the telephone - - "facilitated" the underlying crime or "made it easier." *United States v. Garrett*, 716 F.2d 257, 266 (5th Cir. 1983), *United States v. Pecora*, 693 F.2d 421, 424 (5th Cir. 1982), and *United States v. Perrin*, 580 F.2d 730, 736 (5th Cir. 1978). There is no reason that the nexus requirement for § 1958 should be any different.

24

> FN6.  There was some confusion in Cisneros's original brief about whether "in furtherance" related to causation, intent, or to the nexus between the use of the facility and the underlying crime. Cisneros only clarified this argument in her motion for rehearing.  As we now understand it, "in furtherance" refers to the nexus between the crime and the use of the facility in foreign commerce.

> When we consider Cisneros's argument challenging the sufficiency of the evidence based on the appropriate standard, it does not succeed.  There was sufficient evidence to establish a sufficient nexus between the use of the facility in foreign commerce and the murder scheme because the telephone calls unquestionably facilitated in arranging the murder.  Without Martinez's incessant reminders during those calls, it is reasonable for a jury to have believed that Garza would not have made as serious an effort to find a hit man.  In this respect, the nexus here is at least as strong as those in the Travel Act cases previously mentioned. [FN7].

203 F.3d at 344 (FN 7 omitted).  Consistent with the modification in its analysis, the court modified

its analysis of Cisneros's assertion that the court erred by not submitting her instruction "that the use

of the facility in foreign commerce had to have been in furtherance of the murder for hire."  203 F.3d

at 346.  The court observed:

> Here, it may well be true that Garza did not place the calls "in furtherance" of the murder-for-hire scheme.  He called Martinez for marital advice.  Martinez was the one who would bring up the subject of the Fischer murder.  But those international calls gave Martinez the opportunity to pursue her earlier requests that Garza arrange the murder.  In that sense, they facilitated the murder, even though the use of the telephone across national boundaries was purely incidental.  The difference between "in furtherance" and "facilitated" therefore, can be significant.  For that reason, Cisneros's proposed instruction was not substantially correct, and the district court's failure to give it does not constitute reversible error.

203 F.3d at 346.

Turning to the district court's refusal to submit Cisneros's requested instruction on

"causation", the panel elaborated beyond its analysis in its initial opinion:

> Cisneros's fourth requested instruction was an explanation of "causation":

25

A person causes another to travel in foreign commerce or to use facilities in foreign commerce if he does an act with knowledge that the foreign travel or use of facilities in foreign commerce will follow in the ordinary course of business, or where such foreign travel or use of facilities in foreign commerce can reasonably be foreseen, even though not actually intended.

Although this instruction is loosely based on the causation requirement of the federal mail fraud statute, *see United States v. Sneed*, 63 F.3d 381, 385 n.4 (5ᵗʰ Cir. 1995), the district court did not abuse its discretion in rejecting this instruction. First, we note that the source was, to be sure, from a different statute. Second, and more importantly, Cisneros's version is simply incorrect. One problem is that it confuses intent with causation: "if he does an act with knowledge that the ... use of the facilities in foreign commerce will follow." Yet, even more significantly, the instruction requires that the specific use of the facility in interstate travel that actually occurred must have been foreseeable: "where *such* foreign travel or use of facilities in foreign commerce can reasonably be foreseen." That is not what is required by the simple causation element. Consequently, her proposed instruction was not substantially correct, and the failure to give it does not constitute an abuse of discretion. [FN 11]

> FN 11. Again we note that the district court failed to give an instruction explaining the notion of causation to the jury. Instead, the one it gave related to the *mens rea* requirement with respect to causation. The reason for this instruction instead of one explaining causation can be attributed, at least in part, to the confusion in Cisneros's proposed instruction, which mixed the two together. The confusion continued to appear in Cisneros's briefs to this court.

203 F.3d at 347. Other than the changes specifically cited, the panel's opinion was unchanged and the conviction was affirmed.

3.    Order granting rehearing en banc and consolidation

On February 24, 2000, the court of appeals determined on its own motion to rehear the cases of *United States v. Cisneros* and *United States v. Marek* en banc. *United States v. Cisneros*, 206 F.3d 448 (5ᵗʰ Cir. 2000); *United States v. Marek*, 206 F.3d 449 (5ᵗʰ Cir. 2000).

4.    238 F.3d 310

In *United States v. Marek*, 238 F.3d 310 (5th Cir. 2001) (en banc), the en banc court noted a conflict between the panel opinion in *United States v. Marek*, 198 F.3d 532 (5th Cir. 1999) and the opinion in *United States v. Cisneros*, 203 F.3d 333 (5th Cir. 2000). The court discerned that the *Cisneros* panel, in dicta, suggested that the jurisdictional element of 18 U.S.C. § 1958, required proof that "a facility must be used in an *inter* state fashion, *i.e.*, that *intra* state use would not suffice, even though that facility is one that generally is an interstate commerce facility." 238 F.3d at 313. The court granted en banc review to reconcile the differences and announce a consistent position for the Fifth Circuit. The court adopted the position taken by the panel in *Marek*: section 1958's *use* of "a facility in interstate commerce" was deemed synonymous with the "use of an interstate commerce facility" and satisfied the jurisdictional element of the federal murder for hire statute, irrespective of whether the particular transaction in question is itself *inter* state or wholly *intra* state." 238 F.3d at 313.

The en banc court cited the facts set forth in the *Cisneros* opinion as it began its analysis of the conflict. 238 F.3d at 314 & n.10. The court then made this critical observation:

> A crucial factual distinction between *Marek* and *Cisneros* exists: In *Cisneros* the subject telephone calls were unquestionably international so the *use* of the telephone facility was international ("foreign"), as is the telephone facility itself; in *Marek*, however, there was only an *intra* state communication (a wire transfer of funds between two Texas cities), albeit the communication facility, Western Union, is an interstate commerce facility. Therefore, to affirm *Marek*, we must conclude that § 1958 reaches *intra* state use of a facility in interstate commerce. **In *Cisneros*, on the other hand, even if we assume *arguendo*, that the statute should be accorded the narrowest interpretation possible, we must affirm Cisneros's conviction on the strength of the international (foreign) telephone calls**.

238 F.3d at 314 (emphasis added). Later, the en banc court noted the two theories advanced by the government to satisfy the jurisdictional element of § 1958, and adopted the panel's conclusion that

the international telephone calls satisfied the government's burden, precluding consideration of the travel theory. 238 F.3d at 316 & n.20. With respect to Cisneros, the en banc court concluded that Cisneros violated § 1958 by causing a facility in foreign commerce to be used to facilitate a murder-for-hire and affirmed her conviction without additional discussion touching upon the other issues advanced by Cisneros on direct appeal.

The court subsequently denied Cisneros's motion for rehearing and the Supreme Court denied her petition for certiorari, *Garcia Cisneros v. United States*, _ U.S. _, 122 S.Ct. 37 (2001).

III

GROUNDS FOR RELIEF

In her motion for relief under 28 U.S.C. § 2255, Cisneros advances the following grounds for relief:

1.  Cisneros asserts that she was denied due process of law because the Fifth Circuit did not re-address her sufficiency of the evidence complaint;

2.  Cisneros asserts that she was denied due process of law because the Fifth Circuit did not re-visit her complaint that there was an insufficient jurisdictional nexus;

3.  Cisneros asserts that she was denied due process of law because the Fifth Circuit did not re-address her complaint that the district court submitted inadequate jury instructions on the jurisdictional nexus;

4.  Cisneros asserts that she was denied due process of law because the Fifth Circuit did not reassess the merits of the district court's refusal to submit an instruction on causation;

5.  Cisneros asserts that she was denied due process of law because the Fifth Circuit did not re-visit her complaint that the district court erred when it refused to submit her proposed instruction on the statute of limitations defense;

28

6.      Cisneros asserts that she was denied due process of law and her right to a fair trial because the jury was inadequately instructed on the issue of causation;

7.      Cisneros asserts that the government abrogated her right to a fair trial by reportedly failing to disclose Daniel Garza's purported modification of his testimony between May 11, 1998 and February 5 and 18, 1998;

8.      Cisneros asserts that her right to a fair trial was violated as a result of the government's alleged use of perjured testimony;

9.      Cisneros asserts that her right to a fair trial and her right to the effective assistance of counsel was violated as a result of -

      a.      Counsel's failure to object to transcripts of conversations between Daniel Garza and Maria Martinez;

      b.      Counsel's failure to develop testimony during cross examination of Maria Martinez that she was aware of the fact that Garza called her from Dallas and San Antonio but not Mexico;

      c.      Counsel's inadequate cross-examination of Daniel Garza;

      d.      Counsel's failure to elicit testimony tending to demonstrate inconsistencies in Daniel Garza's testimony;

      e.      Counsel failed to request an instruction requiring the jury to find the telephone calls from Mexico were sufficiently related to the murder-for-hire scheme to support the jurisdictional element of 18 U.S.C. § 1958; and

      f.      Counsel failed to adequately request an instruction on causation.

10.      Cisneros asserts that her right to the effective assistance of counsel on appeal was violated in the following respects:

      a.      Counsel failed to adequately raise issues on appeal challenging the propriety of the district court's "foreign commerce" instruction;

      b.      Counsel failed to adequately raise an issue on direct appeal with respect to "causation:; and

      c.      Counsel failed to raise an issue on direct appeal touching upon misconduct occurring before the grand jury.

IV

## RESPONSE, MOTION TO DENY RELIEF AND AUTHORITIES

A.    Response to Grounds for Relief 1 through 5

In her first five grounds for relief, Cisneros bemoans the failure of the en banc court of appeals to re-visit and issue an opinion on issues that were addressed and ruled on in the two panel opinions. Cisneros asserts that this failure denies her right to due process and her "right to a meaningful appeal." One pauses to ask what precisely this court is to make of these issues - rule that the superior court erred? Fortunately, the court is extricated from this dilemma by the Fifth Circuit's holding in *United States v. Pajooh*, 143 F.3d 203 (5th Cir. 1998). Moreover, the doctrine of the law of the case precludes relief on these grounds.

In *Pajooh*, the court, in an opinion denying a petition for rehearing, confronted the issue of whether an affirmance without an opinion deprived a litigant of due process of law. The court initially observed that under Local Rule 47.6, the Fifth Circuit could affirm a judgment or order without opinion under the following circumstances: (1) that a judgment of the district court is based on findings of fact that are not clearly erroneous; (2) that the evidence in support of a jury verdict is not insufficient; (3) that the order of an administrative agency is supported by substantial evidence on the record as a whole; (4) in the case of summary judgment, that no genuine issue of material fact has been raised by the appellant; and (5) no reversible error of law appears. If these circumstances are met, the court, in its discretion, may enter the order "AFFIRMED". 143 F.3d at 204.

After summarizing the rule, the court held that the rule did not abrogate Pajooh's right to due process and to a meaningful appeal. The court proceeded from the premise that "a review by an appellate court of the final judgment in a criminal case, however grave the offense of which the

30

accused is convicted, was not at common law, and is not now, a necessary element of due process of law." 143 F.3d at 204 (quoting *McKane v. Durston*, 153 U.S. 684, 687, 14 S.Ct. 913, 915 (1894)). With respect to Pajooh's complaint that his statutory right to "meaningful appellate review" was violated, the court observed: "Litigants are entitled to have all issues fully considered and ruled on by a panel of the Court of Appeals. Appellant, however, seems to equate meaningful review to a full written opinion. In doing so, Appellant fails to distinguish between the review process and the manner in which the Court announces its decision." 143 F.3d at 204. The court concluded that its summary affirmance did not abrogate Pajooh's right to meaningful review.

Under *Pajooh*, it is clear that Cisneros's right to due process of law has not been violated by the en banc court's decision not to revisit all of the issues ruled on by the panel in its two published opinions. Moreover, those two published opinions preclude a finding that Cisneros has been denied a right to meaningful appellate review - the appellate court has considered her appeal no less than four times and found her complaint wanting. For this reason, relief on Cisneros's first five grounds for relief should be summarily denied.

This court can also justify summary denial of relief under the law of the case doctrine. Once issues in a particular case have been raised and decided on a direct appeal, then they are barred from collateral review under § 2255. *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986) *cert. denied* 476 U.S. 1118 (1986); *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997). Furthermore, "[i]t is settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 Motions." *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986) *cert. denied* 476 U.S. 1118 (1986) (citing *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980) *cert. denied* 446 U.S. 945 (1980)).

31

The law of the case doctrine is the rule under which the trial court and the appellate courts are bound by any findings of fact or conclusions of law made by the appellate court in a prior appeal of the case at issue. *United States v. Burns*, 662 F.2d 1378, 1384 (11th Cir. 1981). The Fifth Circuit outlined the scope of the law of the case doctrine in *United States v. 8.41 Acres of Land*, 783 F.2d 1256 (5th Cir.), *cert. denied*, 479 U.S. 820, 107 S.Ct. 85 (1986):

> The doctrine of the law of the case forecloses a different result from that which was obtained in the earlier of two appeals. A decision of a legal issue by an appellate court establishes the law of the case which must be followed in all subsequent proceedings in the same case whether those proceedings take place at the trial court or in the appellate court, unless one of the following three exceptions is met: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to such issue, or (3) the prior decision was clearly erroneous and would work manifest injustice. *EEOC v. International Longshoreman's Association*, 623 F.2d 1054, 1058 (5th Cir. 1980), *cert. denied*, 451 U.S. 917, 101 S.Ct. 1997 (1981). *See, e.g., Chapman v. National Aeronautics and Space Administration*, 736 F.2d 238, 241 (5th Cir.), *cert. denied*, _ U.S. _, 105 S.Ct. 517 (1984); *United States v. 162.20 Acres of Land*, 733 F.2d 377, 379 (5th Cir. 1984), *cert. denied*, _ U.S. _, 105 S.Ct. 906 (1985). The doctrine does not reach questions which were not decided in a former proceeding, but it does cover those issues decided by necessary implication as well as those decided explicitly. *International Longshoreman's Assoc.*, 623 F.2d at 1058. *Chapman*, 736 F.2d at 241.

*United States v. 8.41 Acres of Land*, 783 F.2d at 1259.

The court recently elaborated on the law of the case doctrine in *United States v. Matthews*, 312 F.3d 652 (5ᵗʰ Cir. 2002). "Under the law of the case doctrine, an issue of fact or law decided on appeal may not be reexamined by the district court on remand or by the appellate court on a subsequent appeal." 302 F.3d at 657 (quoting *Tollett v. City of Kemah*, 285 F.3d 357, 363 (5ᵗʰ Cir. 2002)). The court explained that the law of the case is not a jurisdictional rule, but a discretionary practice. "The doctrine 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Id.* (quoting *Messinger v. Anderson*, 225 U.S. 436,

444, 32 S.Ct. 739 (1912)).  The doctrine is not inviolate and is subject to three exceptions (1) the

evidence at a subsequent trial is substantially different; (2) there has been an intervening change of

law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a

manifest injustice.  302 F.3d at 657.

In the case-at-bar, the court of appeals explicitly addressed and ruled on each of the five

issues raised by Cisneros's herein in the two panel opinions.  When the en banc court affirmed

without opinion on these issues it implicitly adopted the holding of the panel on these specific issues.

Accordingly, this court should enter an order summarily denying Cisneros § 2255 relief on the

several grounds that she was denied her right to due process of law and her right to a meaningful

appeal.

B.    Response to ground for relief 6

Cisneros renews her complaint that the district court failed to submit an adequate instruction

on the concept of "causation".  In the second opinion issued by the panel, the court of appeals

expressly rejected Cisneros's assertion that this court erred when it failed to submit her instruction

that the jury had to find that it was "reasonably foreseeable" to Cisneros that interstate or foreign

facilities would be used in the commission of the murder-for-hire scheme and affirmed the district

court's decision that this instruction did not correctly state the law.  The en banc's affirmance of the

conviction without opinion on this issue constitutes the law of the case and to that extent relief must

be denied unless Cisneros can demonstrate "clear error" and that the absence of the instruction works

a manifest injustice.

In her motion for relief under 28 U.S.C. 2255, Cisneros reframes the issue and asserts that

the court's failure to submit any instruction on "causation" constitutes a denial of due process and

a fair trial. Cisneros acknowledges that she is raising this issue in this particular manner for the first time on appeal and that she must demonstrate "cause" and "prejudice". *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996); *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996). The question of whether a procedural default bars a defendant from securing collateral relief, was decided by the *en banc* United States Court of Appeals for the Fifth Circuit in *United States v. Shaid*, 937 F.2d 228 (5th Cir. 1991)(*en banc*). In *Shaid*, the Court addressed the issue of whether a defendant can obtain section 2255 relief without demonstrating "cause" for failure to raise an error at trial or on direct appeal. *Shaid*, 937 F.2d at 229. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice', *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), or that he is 'actually innocent', *Murray*, 477 U.S. at 496; *Smith v. Murray*, 477 U.S. 527, 537 (1986)." *Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604 (1998).

Cisneros's complaint that the failure to submit an instruction on "causation" constitutes a manifest injustice falls on the record. It is beyond cavil that Martinez availed herself of Daniel Garza's international telephone calls to press Garza to secure someone to kill Joey Fischer. These conversations took place solely as a consequence of Cisneros's insistence that Martinez assist her in Cisneros's quest to find someone to punish Joey Fischer. Moreover, as the second panel opinion noted, the instruction ultimately submitted to the jury touched upon Cisneros's mens rea - this was precisely how the Cisneros' trial team framed the defense - Cisneros has no way of knowing that the events she set in motion would cause her agents to use a foreign facility to advance her murder-for-hire scheme. Relief on this ground should be summarily denied because the absence of a preferred

34

instruction on "causation" did not work manifest injustice and Cisneros's substantial rights were not adversely affected.

C.    Response to grounds 7 and 8

In her seventh and eight grounds for relief, Cisneros advances the proposition that the government withheld evidence that it was obligated to disclose, to wit, when Daniel Garza declared that he and Martinez had engaged in telephone conversations in foreign commerce, as opposed to simply in *intra* state commerce, and thereafter, the government allowed Garza to create a false impression, to wit, that foreign telephone facilities were used to promote the murder of Joey Fischer. Since the issues raised in the instant controversy were not raised before the district court at trial or on direct appeal, this court must first determine whether relief is procedurally barred. *United States v. Placente*, 81 F.3d 555, 558 (5th Cir. 1996); *United States v. Gaudet*, 81 F.3d 585, 589 (5th Cir. 1996). The question of whether a procedural default bars a defendant from securing collateral relief, was decided by the *en banc* United States Court of Appeals for the Fifth Circuit in *United States v. Shaid*, 937 F.2d 228 (5th Cir. 1991)(*en banc*). In *Shaid*, the Court addressed the issue of whether a defendant can obtain section 2255 relief without demonstrating "cause" for failure to raise an error at trial or on direct appeal. *Shaid*, 937 F.2d at 229. "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice', *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977), or that he is 'actually innocent', *Murray*, 477 U.S. at 496; *Smith v. Murray*, 477 U.S. 527, 537 (1986)." *Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604 (1998); *Strickler v. Greene*, 527 U.S. 263, 282-83 119 S.Ct. 1936 (1999) (claim

35

the government violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194 (1963), raised for the first time in an action for habeas corpus relief subject to analysis for procedural default).

The *Shaid* Court observed that a collateral challenge cannot do service for an appeal. *Id.* at 231 (*citing United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593 (1982)). After conviction and exhaustion or waiver of any right to appeal, the Court is entitled to presume that the defendant stands fairly and finally convicted. *Id,* at 232 (*quoting United States v. Frady,* 456 U.S. at 164, 102 S.Ct. at 1592). A defendant can challenge his conviction after it is presumed final only on issues of jurisdictional or constitutional magnitude. *Shaid,* at 232 (*citing Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471 (1962)). An issue cannot be raised for the first time on collateral review without showing both "cause" for his procedural default, and "actual prejudice" resulting from the error. *Shaid,* at 232 (*citing Frady,* 456 at 168, 102 S.Ct. at 1594). If the error is not of constitutional or jurisdictional magnitude, the defendant must show that the error could not have been raised on direct appeal, and if condoned, would result in a complete miscarriage of justice. *Shaid,* n.7, at 232 (*quoting United States v. Capua,* 656 F.2d 1033, 1037 (5th Cir. 1981)).

A defendant must meet the "cause" and actual prejudice test even when he alleges a fundamental constitutional error. *Shaid,* at 232 (*citing, Murray v. Carrier,* 477 U.S. 478, 493, 106 S.Ct. 2639, 2648 (1986)). The Supreme Court has held that the "cause" and "prejudice" standard applies to inadvertent attorney errors as well as deliberate tactical decisions. *Id.* (*citing Smith v. Murray,* 477 U.S. 527, 533, 106 S.Ct. 2661, 2665 (1986)).

"A change in the law amounts to sufficient cause for failing to object only if the change is so novel that its legal basis was not reasonably available or foreseeable at the time of trial. *Reed v. Ross,* 468 U.S. 1, 16, 104 S.Ct. 2901, 2910 (1984). *Murray v. Carrier,* 477 U.S. 478, 486-87, 106

36

S.Ct. 2639, 2644-45 (1986)(the mere fact that counsel failed to recognize the factual or legal basis

for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for procedural

default). . ." *Shaid*, 937 F.2d at 231 n.5.

"To succeed on a *Brady*[4] claim, a defendant must establish (1) that evidence was suppressed;

(2) that this evidence was favorable to the accused; and (3) that the evidence was material either to

guilt or punishment." *Jackson v. Johnson*, 194 F.3d 641 648 (5th Cir. 1999) (citing *Strickler v.

Green*, 119 S.Ct. 1936 (1999) ("The question is not whether the defendant would more likely than

not have received a different verdict with the evidence, but whether in its absence he received a fair

trial, understood as a trial resulting in a verdict worthy of confidence")); *Felder v. Johnson*, 180 F.3d

206, 212 (5th Cir. 1999); *United States v. Fisher*, 106 F.3d 622, 635 (5th Cir. 1997).); *United States

v. Neal*, 27 F.3d 1035, 1050 (5th Cir. 1994) (quoting *United States v. Ellender*, 947 F.2d 748, 756

(5th Cir. 1991)). Evidence is material "only if there is a reasonable probability that, had the evidence

been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable

probability' is the probability sufficient to undermine confidence in the outcome." *Jackson*, 194 F.3d

at 649-50; *Neal*, 27 F.3d at 1050 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct.

3375, 3383 (1985)).

Cisneros buttresses her discovery complaint with the assertion that the government allowed

Garza to create a false impression before the jury on the use of the foreign telephone facilities. The

government must not deliberately use perjured testimony or encourage the use of perjured testimony.

*United States v. Bethley*, 973 F.2nd 396, 399 (5th Cir. 1992) (citing *Napue v. Illinois*, 360 U.S. 264,

---

[4]*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963).

269-70, 79 S.Ct. 1173, 1177-78 (1959); *United States v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987). To demonstrate a due process violation stemming from the use of perjured testimony, the defendant must show that the prosecution knowingly presented materially false evidence to the jury. *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir. 1994). *United States v. Blackburn*, 9 F.3d 353, 357 (5th Cir. 1993). *United States v. Martinez-Mercado*, 888 F.2d 1484, 1492 (5th Cir. 1989). To obtain a new trial on the ground that the United States used false testimony, the defendant must show "(1) the testimony was false, (2) the prosecution knew it was false, and (3) it was material." *United States v. Grosz*, 76 F.3d 1318, 1327 (5th Cir. 1996). The judge's job, in connection with an alleged *Napue* violation, is to grant a new trial when the fact-finding function of the jury has been corrupted by material falsehood of which the government was aware. *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997).

The Fifth Circuit has limited material lies to those that occur as a part of the prosecutor's case. *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997). To constitute a due process violation, the perjury must have been material to the defendant's conviction. *Creel v. Johnson*, 162 F.3d 385, 391 (5th Cir. 1998). "Evidence is material if a reasonable probability exists that had the evidence been disclosed to the defense, the proceeding's result would have been different." *Blackmon v. Johnson*, 145 F.3d 205, 208 (5th Cir. 1998).

Cisneros's argument turns wholly on the proposition that her trial team could not effectively impeach Garza's and Martinez's credibility on the issue of whether or not the foreign telephone conversations took place. A cursory review of the record belies this assertion. Garza was subjected to a thorough cross-examination which was bolstered by the testimony of Special Agent Church. Indeed, from the length and breadth of Cisneros's motion, it appears that Cisneros's trial counsel

availed themselves of extensive pre-trial discovery.  Nevertheless, Cisneros asserts that knowledge of when Garza allegedly changed his story would have enabled her to more effectively advance her defense.  Initially, it is doubtful that the government had in its possession evidence of such a change.  Moreover, the impact of this reported change on the outcome of the proceeding is dubious - the fact that Garza's testimony differed from this interviews and state testimony was obvious to the jury and his veracity was thoroughly assailed during his cross-examination.  In sum, absent a showing that the testimony offered by the government was fabricated, any alleged discovery violation did not prejudice Cisneros's defense.

D.    Response to ground for relief 9

In ground for relief number 9, Cisneros advances six alleged deficiencies in her trial counsel's efforts to show that she was denied her right to the effective assistance of counsel at trial. To secure relief under a complaint for ineffective assistance of counsel, a § 2255 petitioner must show (1) counsel's performance was deficient and (2) prejudice.  A criminal defendant alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838 (1993)(quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984)).  In *Fretwell*, the Court observed:

> [An] analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.  To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

506 U.S. at 369-70.  The "prejudice" prong of the *Strickland* test focuses on the question of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding

39

fundamentally unfair. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* at 372. *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).

The burden falls on the accused to prove a violation of constitutional standards. The focus is on the attorney's impact on the adversarial process; the constitutional standards may be met irrespective of an accused's evaluation. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984). To prevail on her claim, Cisneros must identify the acts or omissions that are outside the wide range of professionally competent assistance and then demonstrate that but for counsel's unprofessional errors the result of the proceeding would have been different. 466 U.S. at 694, 104 S.Ct. at 2068. A reviewing court must endeavor to eliminate the distorting effects of hindsight and evaluate the facts from counsel's perspective at the time of trial. To this end the court will indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance. *Id.* The reasonableness of counsel's challenged conduct must be judged "on the facts of the particular case, viewed as of the time of counsel's conduct" and the reviewing court "must strongly presume that counsel has exercised reasonable professional conduct." *United States v. Samples*, 897 F.2d 193, 196 (5th Cir. 1990)(citations omitted).

Cisneros asserts that her attorneys' failure to object to the offer of transcripts of conversations between Martinez and Garza must be deemed unreasonable and deficient. The Fifth Circuit has observed that it "will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices. . . . "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Green v. Johnson*,

40

116 F.3d 1115, 1122 (5th Cir. 1997) (quoting *Garland v Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)(on rehearing)). Cisneros notes that her attorneys initially successfully excluded the transcripts in controversy. The evidence was subsequently admitted, without objection, after Cisneros had cross-examined Martinez with said cross-examination relying in part upon the transcripts. Cisneros instant complaint is grounded wholly upon hindsight. At the time of trial it was reasonable to believe that the jury would see the inconsistencies in Martinez's testimony and the conversations set out in the transcripts. Notwithstanding counsel's argument to the contrary, the failure to object to the admission of the tapes and transcripts is not outside the wide range of reasonable assistance and is not deficient. Relief on this ground should be summarily denied.

Cisneros's second assertion of deficient performance should fail for precisely the same reason as the first: She complains that counsel blundered by failing to cross-examine Martinez with respect to her knowledge of where Daniel Garza was when they discussed the proposed murder of Joey Fischer. The scope of cross-examination is a tactical decision. Counsel's focus at trial was on demonstrating that Daniel Garza did not testify truthfully when he declared he called Martinez from Mexico. Counsel decision not to probe Martinez's knowledge of Garza's whereabouts during the telephone conversations was reasonable at the time of trial - the focus was on her involvement as Cisneros's first contact in securing a murderer. Relief on this ground should be summarily denied.

Cisneros's third complaint is grounded wholly in hindsight. Daniel Garza was subjected to a thorough cross-examination and reasonable counsel would have felt confident that the jury would not believe him. Counsel's failure to utilize testimony from the state trial (evidence that counsel successfully and valiantly fought to keep from the jury) is not unreasonable. Relief on this ground should be summarily denied.

41

Cisneros's fourth complaint is grounded on counsel's failure to secure the sequence of events that became manifest in Daniel Garza's testimony that he made telephone calls from Mexico. This, like the preceding issues is grounded wholly on hindsight and second-guessing. Counsel's total representation of Cisneros at trial far exceed the wide-range of assistance otherwise deemed reasonable. Counsel's efforts on Cisneros's behalf did not abrogate her right to a fair trial. Accordingly, relief on this ground should be summarily denied.

In her fifth and sixth complaints, Cisneros bemoans her counsel's failure to secure an adequate instructions on the jurisdictional nexus. It is beyond cavil that this court instructed the jury to find that Cisneros caused someone to engage in foreign travel or to use a foreign facility. Cisneros was able to advance the argument that the government did not prove that Cisneros caused anyone to travel in foreign commerce or use a foreign facility to advance the scheme to murder Joey Fischer. Counsel pursued a different instruction at trial; its rejection was affirmed on appeal. Counsel's efforts were demonstrably reasonable and the failure to secure a different instruction did undermine the reliability of the outcome. Relief on this ground should be summarily denied.

E.    Response to ground for relief 10

In her tenth ground for relief, Cisneros alleges she received ineffective assistance from her appellate counsel for failing to raise several errors on appeal. Although petitioner is entitled to the effective assistance of counsel on appeal, *Evitts v. Lucey*, 469 U.S. 387, 105 S.Ct. 830 (1985), she is not entitled to relief merely because counsel failed to raise and argue some non-frivolous point. *Jones v. Barnes*, 463 U.S.745, 103 S.Ct. 3308 (1983). To obtain relief on this issue, the petitioner must show that he would likely have obtained relief on this issue if it had been raised.

42

If the appellate court finds that an appeal would be totally frivolous and not "taken in good faith," that appeal may be dismissed. *Ellis v. United States*, 356 U.S. 674, 78 S.Ct. 974 (1958); *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967). There is no requirement that an appellate counsel raise every non-frivolous issue on appeal to show competency. Appellate counsel may select the issue or issues he thinks may provide the best chance for reversal. *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308 (1983). The appellate counsel's discretion is limited.

> With a claim that counsel erroneously failed to file a merits brief, it will be easier for a defendant-appellant to satisfy the first part of the Strickland test, for it is only necessary for him to show that a reasonably competent attorney would have found one nonfrivolous issue warranting a merits brief, rather than showing that a particular nonfrivolous issue was clearly stronger than issues that counsel did present.

*Smith v. Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746 (2000).

In *United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999), the United States Court of Appeals for the Fifth Circuit encountered a case in which counsel proved to be ineffective on direct appeal. The *Williamson* court noted that the Fifth Circuit assessed the effectiveness of appellate counsel under the *Strickland* standard. 183 F.3d at 462. The court observed that "a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not prove fruitful... Solid meritorious arguments based on direct controlling precedent should be discovered and brought to the court's attention." 183 F.3d at 462-463. The court concluded that Williamson's attorney did not provide "objectively reasonable assistance" when counsel failed to discover a precedent clearly applicable to Williamson's case. 183 F.3d at 463. The court further held that counsel's deficient performance adversely affected Williamson's substantial rights at sentencing. *Id*. at 464. *But see, Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001) ("to

43

demonstrate prejudice, the petitioner had to show a reasonable probability that, but for his counsel's unreasonable failure ... he would have prevailed on appeal").

In *Jameson v. Coughlin*, 22 F.3d 427 (2nd Cir. 1994), Jameson asserted that he was denied effective assistance of counsel on appeal because his appellate counsel failed to raise an issue that netted his co-defendant a new trial. The Second Circuit noted that in evaluating the reasonableness of counsel's performance, "a court must 'judge the reasonableness of the counsel's challenged conduct on the facts of the particular case, **viewed as of the time of counsel's conduct**.' 22 F.3d at 429. The court observed that, in light of the applicable precedents at the time of the appeal, it was reasonable for counsel to conclude that raising the issue raised by the co-defendant would not have been effective appellate strategy. Id. Prior to concluding that Jameson failed to show that counsel's conduct was outside of the wide range of reasonable professional assistance, the *Jameson* court reviewed the applicable precedents:

> Indeed, the Supreme Court has held that even where a criminal defendant has requested that his attorney raise certain issues on appeal (and Jameson did not urge that the juror issue be raised), there is no constitutional right "to have appellate counsel raise every nonfrivolous issue that the defendant requests." *Jones v. Barnes*, 463 U.S. 745, 754 n. 7, 103 S.Ct. 3308, 3314 n.7 (1983). Nor can counsel be deemed incompetent for failing to predict that the New York Court of Appeals would later overrule the Second Department's reasonable interpretation of New York law. See *Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir.)("The Sixth Amendment does not require [appellate] counsel to forecast changes or advances in the law, or to press meritless arguments before a court."), *cert. denied,* _ U.S. _, 114 S.Ct. 154 (1983); *United States ex rel. Roche v. Scully*, 739 F.2d 739, 742-44 (2nd Cir. 1984).

22 F.3d at 429-30.

In *United States v. Kleinbart*, 27 F.3d 586 (D.C. Cir. 1994), Kleinbart complained that appellate counsel was ineffective for failing to challenge two jury instructions on direct appeal. The court of appeals noted that one of the issues had not been preserved at trial and, in light of the

44

evidence, it was highly improbable that the court would have found plain error. With respect to the second issue, the court observed that appellate counsel's determination that the general intent instruction given by the trial judge was sufficient constituted reasonable assistance, given the unclear state of the law on the required level of intent. 27 F.3d at 593. The *Kleinbart* court concluded that Kleinbart failed to demonstrate that counsel's performance fell below an objectively reasonable standard. *See also, Sherrill v. Hargett*, 184 F.3d 1172, 1175 (10th Cir.1999) ("counsel is not ineffective for failing to anticipate arguments or appellate issues that only blossomed after defendant's trial and appeal have concluded").

In her first two complaints, Cisneros complains that her appellate attorney failed to adequately advance the jurisdictional nexus issue on direct appeal and this failure abrogated her right to the effective assistance of counsel. In her third complaint, Cisneros complains that counsel should have advanced an argument touching upon misconduct occurring before the grand jury. Viewing the totality of counsel's efforts on appeal, the alleged failure to raise these complaints cannot be deemed deficient. Relief on this ground should be overruled.

The government prays that Cisneros's motion for relief under 28 U.S.C. § 2255 be denied on the record.

Respectfully submitted,

MICHAEL T. SHELBY
United States Attorney

By:

JAMES L. TURNER
Assistant United States Attorney
State Bar No. 2031690
Federal Bar Id. No.1406
Bank One Center
910 Travis, Suite 1500
P.O. Box 61129
Houston, Texas 77208-1129
(713) 567-9102

## CERTIFICATE OF SERVICE

I, James L. Turner, do hereby certify that a true and correct copy of the above and foregoing Response and Motion to Dismiss Cisneros's Motion for Relief under 28 U.S.C. § 2255 was served on January 21, 2003, via certified mail, return receipt requested to:

Mr. David L. Botsford
1307 West Avenue
Austin, Texas 787701

Mr. A.J. "Tony" Canales
P.O. Box 5624
Corpus Christi, Texas 78465-5624

JAMES L. TURNER
Assistant United States Attorney

46

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
|     Respondent, | § | |
| | § | |
|     vs. | § | C.R. NO. B-98-134 |
| | § | |
| DORA CISNEROS. | § | |
|   Petitioner. | § | |
| (C.A. NO. B-02-191) | § | |

<u>ORDER</u>

It is hereby ORDERED that the government's motion to dismiss is granted.

SIGNED this _____ day of _____ 2003.

_____
UNITED STATES DISTRICT JUDGE

.