United States District Court
Southern District of Texas
FILED

JUN 0 9 2005

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | Civil Action No. B-02-191 ✓ |
| V. | § | (Criminal No. B-98-124-01) |
| | § | |
| DORA CISNEROS | § | |

**CISNEROS' REPLY TO THE GOVERNMENT'S "RESPONSE TO CISNEROS'
OBJECTIONS AND MOTION FOR RECONSIDERATION"**

**TO THE HONORABLE ANDREW S. HANEN, UNITED STATES DISTRICT JUDGE:**

Comes now Movant, DORA CISNEROS, by and through her attorney of record, David L. Botsford, and files this her Reply To The Government's "Response To Cisneros' Objections And Motion For Reconsideration," and would respectfully show this Court the following:

I.

By letter dated June 3, 2005, the Government transmitted its "Response To Cisneros' Objections And Motion For Reconsideration." It was received by undersigned counsel (Botsford) on Monday, June 6, 2005. Cisneros' believes a "reply" is entirely appropriate.

Cisneros' understands and appreciates the Government's position: it behooves the Government to oppose production of the notes of the prosecutors and case agents relating to any and all interviews of Garza between February 18, 1998 (the date that Garza was last interviewed by the Government, according to FBI 302 reports, to wit: a memorandum of interview), and May 11, 1998 (the date of Garza's trial testimony). **It bears repeating that in this time frame, Garza changed his story to reflect that, although he *might* have called Martinez collect from Mexico, he *also* called her from phone booths in Mexico and retained no record of the calls. He also changed the time frame so that he *might* minimally/arguably place the alleged phone calls within the five year limitations period. It also bears repeating that it was during**

**this time frame that the telephone records were obtained and actually returned to the grand jury by Special Agent Church (on February 23, 1998, the day Cisneros was indicted herein) that reflected that Garza had never called Martinez collect from Mexico.** The Government has provided no affidavits from the members of the prosecution team or the agents working on the case that reflect that Garza was **not** interviewed or "prepared for testimony" in this time frame. Moreover, it is beyond peradventure that Garza was not "prepared" by some representative of the Government prior to his trial testimony on May 11, 1998 and, given the absence of collect telephone records from Garza to Martinez in this time frame, that whomever was preparing Garza to testify would not have broached the topic and attempted to prepare Garza as to how he should attempt to deflect the anticipated impeachment (due to the fact that the records reflected that Garza did not call Martinez collect from Mexico in this time frame).[1]

It should be recalled that as of February 18, 1998, the Government well knew that Garza had claimed to have called Martinez collect from Mexico, which is what had prompted its effort to obtain Martinez' telephone records (which were received and returned to the grand jury on February 23, 1998). Those records reflected no collect telephone calls from Garza in Mexico to Martinez. Garza's modification of the two critical aspects of his testimony in this critical time

---

[1] To believe that NO representative of the Government prepared Garza to testify is simply incredible. It is common knowledge that witnesses who will testify on direct examination for the Government are thoroughly prepared for direct and cross-examination. To believe that the Government would put its "key" witness on the stand "cold" and without any preparation or contact by the Government between February 18, 1998 and May 11, 1998, is simply unimaginable. Again, on information and belief, the prosecutor (Oscar Ponce) who questioned Garza on direct examination (and who had prosecuted Cisneros in the state court case which resulted in a judgment of acquittal on appeal) probably prepared Garza, but the case agents probably were also involved and transported Garza from the location where he was detained to the office of the United States Attorney. The records relating to any transportation of Garza along with the agents notes and the notes of the prosecutor(s) are essential to full development of Cisneros' claims.

frame is more than "suspicious," **since absent some prompting by the Government, Garza would have had no reason to modify his testimony from his prior statements and testimony.**[2]

The Court should recall what is reflected in Cisneros' motion to vacate (at pages 76 to 81, with all references to Exhibits being Exhibits attached to the motion to vacate) regarding alleged telephone calls from Garza (in Mexico or elsewhere) and the time frame of those alleged telephone calls:

> **A.** Martinez' prior state court testimony which reflected that she had previously testified in the state court litigation that **Garza had called her from Dallas and San Antonio: she never claimed that Garza had ever called her from Mexico.** State Trial Record at pages 1434-1441. *See* **Exhibit 2.**[61]
>
> **B.** From discovery in this case,[62] trial counsel were aware from an FBI 302

---

[2] Given the existence of Garza's prior statements and prior trial testimony (in Cisneros' state court trial), it is even more unlikely that representatives of the Government would not have met with Garza to prepare him for direct and cross-examination.

[61] This sworn testimony reflected that after **Halloween 1992**, the only calls that Martinez received from Garza were as follows:

1. In December 1992, Garza called her from Dallas, at which time he had not been able to come or do anything yet. **Exhibit 2** at 1434.

2. In January 1993, Garza called her once from Dallas, at which time he did not say anything other than that he was busy and that he would come to Brownsville. **Exhibit 2** at 1437.

3. In February 1993, Garza called her twice; once when he said "I'll be there any moment now" (and nothing else, referring, obviously, to the fact that he was going to stop by Martinez' business and was calling from Brownsville), and again from Dallas. **Exhibit 2** at 1439-1442.

4. On March 3, 1993, Garza called her and told her he was coming over to pick up the money (obviously from Brownsville). **Exhibit 2** at 1442.

[62] Cisneros' numerous motions for production of Jencks Act materials and *Brady* and *Giglio* information (pretrial motions numbered 19, 20, 21, 24, and 25 on the District Clerk's

(memorandum of interview) that on August 29, 1996, Maria Martinez had related to FBI Agents Barry Ross and Jorge Cisneros that Garza had called Martinez on numerous occasions, but Martinez did not discuss with them the locations from which Garza had allegedly called her. *See* **Exhibit 3.**

C. From discovery in this case, trial counsel were aware from an FBI 302 (memorandum of interview) that on January 28, 1998, Maria Martinez had related to FBI Agents David Church and Freddy Vela that Garza had told Martinez during their telephone calls that he (Garza) was calling from Dallas and San Antonio, that Garza called Martinez collect every time he called her, and that Martinez was unaware of any telephone calls made to her by Garza that originated from outside of the State of Texas or from Mexico. *See* **Exhibit 4.**[63]

D. From discovery provided by the government on April 24, 1998, trial counsel were aware that there were no collect calls from Mexico to Martinez' home or business telephone numbers.[64]

---

docket) were granted at the pretrial hearing on April 27, 1998. *See* 1R238-239 (courtroom minutes); Transcript of April 27, 1998, pretrial hearing.

[63] That memorandum stated:

"Martinez recalled four to five conversations, by telephone, with Garza in which he inquired why "La Clienta" (Cisneros) was taking so long to get Martinez the picture of Joey Fischer for the hitmen. Martinez stated that these calls were placed from Dallas and San Antonio, Texas, according to Garza. Garza also called Martinez collect every time he contacted her by telephone. Martinez advised that she was unaware of any telephone calls made to her by Garza or Cisneros that originated outside of the State of Texas or from Mexico. Martinez added that she did not make any calls to Garza or Cisneros from outside the State of Texas or from Mexico."

[64] On November 24, 1997, the government had subpoenaed the subscriber information and toll records for Maria Martinez' store at 713 E. 11th Street (210-546-8137). Records responsive to this subpoena were faxed to the government on December 3, 1997. *See* **Exhibit 5**. The documents responsive to this subpoena, as well as the documents responsive to the subpoena FBI Agent David Church "returned" to the Houston grand jury Church on February 23, 1998 (as reflected by his grand jury testimony, which is a sealed exhibit in the vault of the District Clerk and thus not attached hereto as an exhibit), reflect the following:

```
Collect Telephone Calls To Maria Martinez' Home Telephone Number (210-544-6319)
for the time frame of 10/97 to 3/3/98 (Which Phone Was Actually Under The Name
Of George V. Rosales, 1049 C. Street, Brownsville, Texas), as reflected by
documents returned on 2/23/98 by Church to the Houston Grand Jury:

Date          Place Called From        Nature Of Telephone Called From
```

4

E. From discovery provided by the government and from their previous involvment in the state trial and/or state appeal, Cisneros' trial counsel also had the following eight (8) prior statements and prior testimony from Garza, to wit:

1. On March 31, 1993, Garza signed a five (5) page handwritten statement which had been written for him by Deputy Abel Perez, which was reduced to a three (3) page typewritten statement (which he also signed). *See* **Exhibit 6**. No calls from Mexico were mentioned, although Garza did state that he had called Martinez from San Antonio (pages 1 and 3 of typewritten) and Brownsville (page 1 of typewritten).

2. On March 9, 1994, during his state court trial, Garza testified. *See* **Exhibit 7** (Vol. 31, pages 39-96 of state court record). Garza did not claim that he had called Martinez from Mexico, although Garza testified that he had called Martinez from San Antonio (page 48 of Vol. 31).

3. On June 28, 1996, Garza was interviewed by FBI Agents Barry Ross and Jorge Cisneros. *See* **Exhibit 8**. No calls from Mexico (or any other location) were mentioned by Garza.[65]

---

| Date | Place Called From | Nature Of Telephone Called From |
|---|---|---|
| 1/27/98 | Brownsville | Local Coin |
| 1/29/98 | Brownsville | Local Coin |
| 2/16/98 | Brownsville | Local Coin |
| 2/16/98 | Brownsville | Local Coin |
| 2/25/98 | Dallas | Private Phone (214-559-7031) |

Collect Telephone Calls To Maria Martinez' **Business Telephone Number** (210-546-8137), **for the time frame of 10/97 to 3/3/98**, which was under the name of Maria Martinez, 713 E. 11th Street, Brownsville, Texas (fax to government on 12/3/97):

| Date | Place Called From | Nature Of Telephone Called From |
|---|---|---|
| 11/20/97 | Brownsville | Local Coin |
| 12/21/97 | Martinez, Texas | Private Phone (210-661-4288) |
| 2/20/98 | Worthing MN. | Local Coin |

[65] One aspect of Cisneros' anticipated motion for discovery (to be filed in connection with this motion in the near future) will be a request to depose FBI Agents Ross and Cisneros to ascertain whether they induced Garza to speak with them by alluding to potential benefits he might receive from the federal government. Obviously, if there were inducements discussed during their initial meeting, they should have been disclosed to trial counsel notwithstanding the ultimate "deal" as testified to by Garza at trial (i.e., no benefits other than non-prosecution in federal court for the murder for hire). Additionally, FBI Agents Church and Vela should also be deposed to ascertain whether the topic of potential benefits was discussed with Garza in February 1998 or at any date thereafter and prior to Garza's testimony on May 11, 1998. If benefits were discussed with Garza, this motion would have to be amended to include that additional *Brady* violation as the substance of any benefits Garza sought was never disclosed to trial counsel. Similarly, if discovery provides that the "deal" testified to by Garza at Cisneros' trial was not the actual "deal" that Garza anticipated, this motion would have to be amended to incorporate that

4. On September 30, 1996, FBI Agent Ross received a letter from Garza, dated September 2, 1996. No calls from Mexico (or anywhere else) were mentioned, although Garza indicated his willingness to assist if certain conditions of cooperation could be met. *See* **Exhibit 9**.

5. On November 22, 1996, Garza was interviewed by FBI Agents Barry Ross and Jorge Cisneros. No calls from Mexico (or any other location) were mentioned by Garza. *See* **Exhibit 10**.

6. On December 9, 1996, Special Agent Ross received a letter from Garza, dated December 3, 1996. No calls from Mexico (or anywhere else) were mentioned, although Garza indicated his willingness to assist if certain conditions of cooperation could be met. *See* **Exhibit 11**.

7. On February 5, 1998, Garza was interviewed by FBI Agents David Church and Freddy Vela. This memorandum of interview reflects the following:

> "Garza advised, before Fischer was murdered, he would call Martinez quite often regarding his martial problems. According to Garza, during every phone conversation, Martinez would ask about the job to kill Fischer. Garza stated Martinez would refer to the job as a "roof job". **Garza recalled making several calls to Martinez from public telephones in Matamoros, Mexico, and each time Martinez referred to the "roof job" by asking when Garza would find someone to do the job. Garza also advised he would** *always call Martinez collect.*" (emphasis added) *See* **Exhibit 12**.

8. On February 18, 1998, Garza was interviewed by FBI Agents David Church and Freddy Vela. This memorandum of interview reflects the following:

> " **Garza advised he made telephone calls from** *Matamoros, Mexico,* **using public telephones between** *September and November 1992,* **to call Maria Martinez. According to Garza, these calls were** *all collect calls.* **Garza could not recall where the public telephones he used in** *Matamoros* **were located.**" (emphasis added) *See* **Exhibit 13**.

On April 20, 1998, the government filed a bill of particulars indicating that Garza had called Martinez from Matamoros and San Fernando, Mexico, from in or about November 1992 to in or about February 1993. 2R320-321. **No explanation was given as to where or why the time frame and locations had**

---

perjured testimony.

6

changed from that which was related by Garza to the FBI on February 18, 1998, as reflected above in paragraph E8.

Shortly before trial, both Cisneros' trial counsel interviewed Garza in the Cameron County Jail. At that time, Garza told trial counsel that he had not called Martinez from Mexico and/or that he could not remember calling Martinez from Mexico. 11R1395-1397.

Thus, as of the last known interview with Garza on February 18, 1998 (except as contradicted by Garza's statements to Cisneros' trial counsel in the Cameron County Jail), Garza had only mentioned calling Martinez from Matamoros, Mexico, **on two of eight occasions he had communicated with law enforcement and/or had testified in open court**, and then, the time frame was identified as between *September and November 1992*.[66]

## II.

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court discussed suppression of exculpatory information in rich detail. Included in the discussion was the fact that the prosecutor's (Cliff Strider's) notes of his interviews with a critical informant (one "Beanie") had not been made available during the original trial (ending in a mistrial) or in the second trial (resulting in Kyles' conviction and sentence of death). *Id.* at 429-430 ("Notwithstanding the many inconsistencies and variations among Beanie's statements, **neither Strider's notes nor any of the other notes** and transcripts were given to the defense." (emphasis added)). The Supreme Court discussed the materiality of Beanie's various statements to the police and the prosecutor. *Id.* at 444-449. Thus, it is apparent that notes from prosecutors and agents are an appropriate source of materials for purposes of production to the defense in order to fully develop claims of suppression of evidence. Rule 6 of the Rules Governing Section 2255 proceedings affords the

---

[66] Garza's statement in (paragraph **E8**) that the calls were between September and November 1992 thus reflects that the calls from Mexico all occurred **prior** to the date that he learned, for the first time, that Fischer was to be killed. This necessarily follows because Garza testified that it was late January 1993 or early February 1993 when Martinez told him for the first time that the client wanted Fischer killed (as opposed to hurt or beaten, as was the alleged, original request). 11R1360-1363.

7

Court ample discretion to allow the type of discovery sought by Cisneros.

Additionally, the Court should not forget what the Supreme Court has stated about the importance of the great writ:

> The writ of habeas corpus is the fundamental instrument for safeguarding individual freedom against arbitrary and lawless state action. Its pre-eminent role is recognized by the admonition in the Constitution that: 'The Privilege of the Writ of Habeas Corpus shall not be suspended * * *.' U.S.Const., Art. I, s 9, cl. 2. The scope and flexibility of the writ--its capacity to reach all manner of illegal detention--its ability to cut through barriers of form and procedural mazes--have always been emphasized and jealously guarded by courts and lawmakers. **The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.**
>
> As Blackstone phrased it, habeas corpus is 'the great and efficacious writ, in all manner of illegal confinement.' As this Court said in Fay v. Noia, 372 U.S. 391, 401--402, 83 S.Ct. 822, 829, 9 L.Ed.2d 837 (1963), the office of the writ is 'to provide a prompt and efficacious remedy for whatever society deems to be intolerable restraints.' See Peyton v. Rowe, 391 U.S. 54, 65--67, 88 S.Ct. 1549, 1555, 20 L.Ed.2d 426 (1968).
>
> It is now established beyond the reach of reasonable dispute that the federal courts not only may grant evidentiary hearings to applicants, but must do so upon an appropriate showing. Townsend v. Sain, 372 U.S. 293, 313, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Brown v. Allen, 344 U.S. 443, 464, No. 19, 73 S.Ct. 397, 97 L.Ed. 469 (1953). And this Court has emphasized, taking into account the office of the writ and the fact that the petitioner, being in custody, is usually handicapped in developing the evidence needed to support in necessary detail the facts alleged in his petition, that a habeas corpus proceeding must not be allowed to founder in a 'procedural morass.' Price v. Johnston, 334 U.S. 266, 269, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948).
>
> **There is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law. This Court has insistently said that the power of the federal courts to conduct inquiry in habeas corpus is equal to the responsibility which the writ involves:** 'The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary.' Townsend v. Sain, supra, at 312, 83 S.Ct. at 757.

*Harris v. Nelson*, 394 U.S. 286, 290-91 (1968) (emphasis added; footnote omitted).

In large part, the foregoing statements led the Supreme Court in *Harris* to also state the following:

> Flexible provision is made for taking evidence by oral testimony, by deposition, or upon affidavit and written interrogatory. 28 U.S.C. s 2246. Cf. ss 2245, 2254(e). The court shall 'summarily hear and determine the facts, and dispose of the matter as law and justice require.' 28 U.S.C. s 2243. But with respect to methods for securing facts where necessary to accomplish the objective of the proceedings Congress has been largely silent. Clearly, in these circumstances, the habeas corpus jurisdiction and the duty to exercise it being present, the courts may fashion appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage. Where their duties require it, this is the inescapable obligation of the courts. Their authority is expressly confirmed in the All Writs Act, 28 U.S.C. s 1651. This statute has served since its inclusion, in substance, in the original Judiciary Act as a 'legislatively approved source of procedural instruments designed to achieve 'the rational ends of law." Price v. Johnston, 334 U.S. 266, 282, 68 S.Ct. 1049, 1058, 92 L.Ed. 1356 (1948), quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 273, 63 S.Ct. 236, 239, 87 L.Ed. 268 (1942). It has been recognized that the courts may rely upon this statute in issuing orders appropriate to assist them in conducting factual inquiries. American Lithographic Co. v. Werckmeister, 221 U.S. 603, 609, 31 S.Ct. 676, 55 L.Ed. 873 (1911) (subpoenas duces tecum); Bethlehem Shipbuilding Corp. v. NLRB, 120 F.2d 126, 127 (C.A.1st Cir. 1941) (order that certain documents be produced for the purpose of pretrial discovery). In Price v. Johnston, supra, this Court held explicitly that the purpose and function of the All Writs Act to supply the courts with the instruments needed to perform their duty, as prescribed by the Congress and the Constitution, provided only that such instruments are 'agreeable' to the usages and principles of law, extend to habeas corpus proceedings.
>
> At any time in the proceedings, **when the court considers that it is necessary to do so in order that a fair and meaningful evidentiary hearing may be held so that the court may properly 'dispose of the matter as law and justice require,'** either on its own motion or upon cause shown by the petitioner, it may issue such writs and take or authorize such proceedings with respect to development, before or in conjunction with the hearing of the facts relevant to the claims advanced by the parties, as may be 'necessary or appropriate in aid of (its jurisdiction) * * * and agreeable to the usages and principles of law.' 28 U.S.C. s 1651.
>
> We do not assume that courts in the exercise of their discretion will pursue or authorize pursuit of all allegations presented to them. We are aware that confinement sometimes induces fantasy which has its basis in the paranoia of prison rather than in fact. **But where specific allegations before the court show**

9

**reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry.** Obviously, in exercising this power, the court may utilize familiar procedures, as appropriate, whether these are found in the civil or criminal rules or elsewhere in the 'usages and principles of law.'

*Harris v. Nelson, supra* at 299-300 (emphasis added; footnote omitted).

## III.

Cisneros respectfully asserts that at a minimum, the Government should have to produce, if only for the Court in chambers and ex parte,[3] the notes of all agents and prosecutors that had any contact with Garza between February 18, 1998 and May 11, 1998, along with a listing of the dates, location(s), duration, and identity of persons present during any telephone or in person interview of Garza during this critical time frame. Otherwise, the Great Writ will effectively be suspended and the Government will be allowed to continue to violate *Banks v. Dretke*, 124 S. Ct. 1256 (2004), which holds that discovery and a hearing are warranted when the Government has concealed exculpatory and/or impeaching evidence and the Movant otherwise meets the requirements of *Brady v. Maryland*, 373 U.S. 83 (1967).[4] *Banks* states that a method whereby

---

[3] At a minimum, these materials should be ordered produced to the Court and inspected by the Court (along with affidavits from the prosecutors and case agents regarding these materials and their contact with Garza during the critical time frame of February 18, 1998 to May 11, 1998) so that they can be sealed in the record if they are not subsequently supplied to Cisneros. This request is not a waiver of Cisneros' position that she is entitled to the production of these items in discovery and a full evidentiary hearing after discovery and does not waive her prior or subsequent efforts to obtain them and to appeal any prior or subsequent adverse rulings relating thereto.

[4] It is likely that presently suppressed materials contain evidence that the Government had "actual knowledge" during trial of information that contradicted the trial testimony of its critical witness, Garza. *Banks*, 124 S. Ct. at 1264-65; *Strickler v. Greene*, 527 U.S. 263, 273-74 (1999). **This likelihood is increased by the Government's production of no factual denials or arguments against materiality in its answer to Claims for Relief 7 and 8 in Cisneros' § 2255 Motion.** *See* Discovery Motion at 6. **This likelihood is further increased because the Government has not even denied that Garza was interviewed and "prepared" for direct and**

10

a 'prosecutor may hide, defendant must seek,' is not tenable in a constitutional system bound to accord defendants due process." *Banks*, 124 S. Ct. at 1275. That appears to be exactly what is occurring in this case. The Court should grant discovery.

WHEREFORE, PREMISES CONSIDERED, Cisneros reasserts that she has demonstrated that she is entitled to discovery that is necessary for a fair and rounded development of the material facts. She respectfully moves this Court to grant her Motion for Discovery, ordering discovery as appropriate and/or, at a minimum, directing the Government to produce all notes, memorandums and documents reflecting which date(s) between February 18, 1998 and May 11, 1998, Garza spoke with any representative of the Government, specifying as to each such date the location, duration, identity of persons present and topics discussed during those meetings (along with supporting affidavits) for the Court's review (in camera and ex parte in the first instance), and depending upon the contents thereof, allowing production to Cisneros of those materials for further development as may be appropriate.

> Respectfully submitted,
>
> _____
> DAVID L. BOTSFORD
> State Bar No. 02687950
> Law Office of David L. Botsford
> 1307 West Ave.
> Austin, Texas 78701
> 512-479-8030 (phone)
> 512-479-8040 (fax)
>
> A. J. "TONY" CANALES
> State Bar No. 03737000
> P.O. Box 5624
> Corpus Christi, Texas 78465-5624
> 361-883-0601 (phone)

---

**cross-examination by the case agents or prosecutors during this critical time frame.**

361-884-7023 (fax)

**Certificate of Service**

  I, David L. Botsford, do hereby certify that true and correct copies of the above and foregoing document have been served by placing the same in the United States mail, postage prepaid, on this the 8th day of June 2005, addressed to Mr. James L. Turner, Assistant United States Attorney, P.O. Box 61129, Houston, Texas, 77208-1129.

_____
DAVID L. BOTSFORD